UNITED STATES of America, Plaintiff,

v.

M.J., a Juvenile Female, Defendant.

Crim. A. No. CR 88–00065–L(CS).

United States District Court,
W.D. Kentucky,
at Louisville.

Feb. 22, 1989.

Joseph M. Whittle, U.S. Atty., and Steven W. Wilson, Sp. Asst. U.S. Atty., Louisville, Ky., for plaintiff.

David T. Gray, Skeeters & Bennett, Radcliff, Ky., for defendant.

## REVISED MEMORANDUM OPINION AND ORDER

SIMPSON, District Judge.

This matter is before the Court on appeal from the Magistrate's rejection of two tendered single-count criminal complaints. We have jurisdiction pursuant to 18 U.S.C. Section 3731 and Rule 7(a) of the Rules of Procedure for the Trial of Misdemeanors before United States Magistrates.

On June 27, 1988, at approximately 11:20 P.M., M.J. was stopped in her automobile at the Wilson Road gate leading onto the military reservation of Fort Knox. Specialist Mark Johnson, a Military Police Officer, approached M.J.'s vehicle. When M.J. rolled down her window, Johnson claims he detected the strong odor of alcohol coming from the car's interior. He requested that the defendant move through the checkpoint and park her vehicle. He then approached the parked vehicle, looked inside and noticed a large number of empty beer cans strewn about the vehicle's floor. He requested that M.J. step from the vehicle and take a field sobriety test. Johnson claims that he administered three tests and that M.J. failed all three. Johnson believed he had probable cause for the apprehension of the defendant for driving under the influence of alcohol. He states that he placed M.J. under apprehension and called for assistance from fellow Military Police Officer, Private First Class Stephen Dunaway. Dunaway conducted a search of the automobile and discovered the remains of a marijuana cigarette in the ashtray. Dunaway also found a small plastic bag of marijuana in the defendant's purse. He then locked the automobile, and M.J. and her passenger were transported to the Military Police station. M.J. took a breathalyzer test, and was then cited and released.

On the evening M.J. was stopped, members of the Fort Knox Military Police were conducting routine driver's license and vehicle registration checks at Checkpoint No. 1 located at the Wilson Road gate. The MPs stopped every fifth vehicle in accordance with Operational Guidance issued by the Post Military Police Operations personnel. The officers conducting the stops at the checkpoint were in Military Police uniforms wearing reflectorized vests and carrying cone-type flashlights, also in accordance with the Operational Guidance. Each driver stopped was questioned in order to ascertain whether he possessed a valid driver's license and registration. Those that did were allowed to pass through the checkpoint; those that did not were asked to pull off in a parking area beyond the Wilson Road gate guardhouse so that a computer check could be run. A sign posted outside the gate read "Caution Checkpoint Ahead—Use Parking Lights Only". A second sign read "Warning—U.S. Army Installation ... Persons and Vehicles Are Subject to Search Upon Entry into and Exit from Fort Knox and While Within the Boundaries of the Military Reservation".

The Magistrate refused to sign complaints which the United States tendered accusing M.J. of operating a motor vehicle while under the influence of alcohol or other impairing substance and entering Fort Knox while in possession of marijuana. He ordered the complaints not filed, relying on the case of *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). The Magistrate was of the opinion that the

checkpoint stop conducted on the Fort Knox Military Reservation was unconstitutional. He determined that such a stop constituted unreasonable seizure under the Fourth and Fourteenth Amendments. We disagree with the Magistrate's reading of *Prouse,* and reverse.

■ Initially it should be noted that entry onto a military installation differs markedly from traveling on a public highway. A base commander may formulate such rules and regulations as are necessary for the safety and welfare of his installation. He may summarily exclude all civilians from the area of his command. *See Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976). It is also clearly within his authority to place restrictions on the right of access to his base. *United States v. Ellis,* 547 F.2d 863, 866 (5th Cir.1977).

■ Here, regulations concerning searches of vehicles and persons entering Fort Knox were clearly posted outside of the gatepost, where a person approaching could opt to enter or not enter. M.J. "should have realized that [her] actions in presenting [her] vehicle to the guard at the entrance to the [military base] with an implied request to drive thereon carried the possibility of an inspection then and there," as was the case in *Ellis,* supra at 866.

In *Prouse,* the officer acted without standards, guidelines or procedures promulgated by his department or the state attorney general. *Id.* 99 S.Ct. at 1394. He stopped a motorist on a public highway for the purpose of checking the driver's license of the operator and the registration of the car. He had no probable cause or reasonable suspicion to believe that the car was being driven illegally or that the car or its occupants were subject to seizure or detention. Prior to stopping the vehicle, the officer had observed no traffic or equipment violations nor any suspicious activity. He characterized the stop as "routine" and explained "I saw the car in the area and wasn't answering any complaints, so I decided to pull them off." *Id.* at 1394. The Supreme Court found this stop unconstitutional, stating that "an individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation." *Id.* at 1400. The Court noted "to insist neither upon an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion 'would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches ...' *Terry vs. Ohio,* 392 U.S. [1] at 22, 88 S.Ct. [1868] at 1880 [20 L.Ed.2d 889 (1968) ]." *Id.* 99 S.Ct. at 1400.

In this case, the MPs, in police garb, stopped every fifth vehicle coming through the checkpoint. In the event of undue congestion and delay at the gate due to the stops, they were authorized to allow cars to proceed through unchecked only until the congestion was relieved. This was the only discretion given to them in regard to the procedures they were expected to utilize on this duty. Unlike the police officer in *Prouse,* the MPs at the Wilson Road gate had no discretion in choosing cars to stop.

In *Prouse,* concern was expressed that "were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed." *Prouse,* supra 99 S.Ct. at 1401. However, here, the procedures utilized were not completely unfettered. Lessening of discretion on the part of the officer may validate a stopping procedure:

> Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers.

*Prouse,* supra at 1401.

Here, the stops were not on a public highway. Nor were the stops at the unbridled discretion of police officers. They were done according to a neutral, orderly and predetermined procedure.

The stop in *United States v. Prichard*, 645 F.2d 854 (10th Cir.1981) was similar. In *Prichard*, the stated purpose of the roadblock was to conduct a routine driver's license and car registration check. The officers stated that it was their intent to stop all westbound vehicles, except for semi-trucks, which had already been stopped at a port of entry. When the cars began to pile up, the officers would waive all of the stopped cars through in order to prevent the situation from becoming unduly hazardous. The Tenth Circuit found that *Prouse* supported the conclusion that such a roadblock stop was permissible, reasoning:

> While this may not have been a 100 per cent roadblock of the type referred to in *Prouse*, it is nonetheless a long way from the selective, single stop denounced in *Prouse*. In the instant case, the New Mexico State Police were attempting to stop all westbound traffic on an interstate highway, insofar as was humanly possible ... The purpose of the roadblock, i.e., to check driver's licenses and car registrations, was a legitimate one. If, in the process of so doing, the officers saw evidence of other crimes, they had the right to take reasonable investigative steps and were not required to close their eyes.

*Prichard*, supra at 856–857, citing *United States v. Merryman*, 630 F.2d 780, 782–85 (10th Cir.1980).

In *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the Supreme Court reiterated the holding that "the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown*, supra 99 S.Ct. at 2640. We find in this case that explicit, neutral limitations on discretion were placed on the conduct of the MPs through the Operational Guidance issued by the Post Military Police Operations personnel.

In light of the specific procedures utilized here, the lack of unfettered discretion given to the MPs, and the obvious need for access controls at military installations, we have little trouble finding that no infringement of personal privacy occurred here which rises to the level of a constitutional violation.

We therefore OVERRULE the Magistrate and ORDER that the tendered complaints by the United States be filed herein.

IT IS SO ORDERED.