**UNITED STATES, Plaintiff,**

v.

**Dennis DILLON, Defendant.**

No. 97–M–9096–01.

United States District Court,
D. Kansas.

Nov. 4, 1997.

Kris R. Poppe, Sp. Asst. U.S. Atty., Ft. Riley, KS, for Plaintiff.

Michael P. McKone, McKone, Unruh & Graham, Chtd., Junction City, KS, for Defendant.

## MEMORANDUM AND ORDER

REID, United States Magistrate Judge.

The defendant in this case is charged with one count of driving under the influence (DUI), in violation of 18 U.S.C. § 13 and K.S.A. 8–1567(a)(3). The defendant was arrested at Ft. Riley, Kansas, a federal reservation in the state of Kansas. An evidentiary hearing on defendant's motion to suppress was held on October 16, 1997.

On the evening of February 28–March 1, 1997, Ft. Riley military police established a drunk driving identification and vehicle inspection checkpoint at two locations on Ft. Riley. The first location was for outbound traffic near the Main PX parking lot; the second location was on Trooper Avenue for inbound traffic coming onto Ft. Riley.[1] It was at this second checkpoint that the defendant was pulled over in the early morning of March 1, 1997. The checkpoint procedures were set forth in detail and approved by Major General Dodson, the commander at Ft. Riley. All vehicles were subject to the checkpoints. A sign was posted indicating that vehicle inspection was ahead. The military policemen were clearly marked as law enforcement, and emergency lighting was utilized at the scene of the checkpoint. No advance notice was given to the public that the checkpoints were being established that evening.

There is also a sign at the entrance to Ft. Riley on Trooper Avenue which lists rules for Ft. Riley. Rule No. 3 states that "entry constitutes consent to inspection of persons[,] property and vehicles when entering on or exiting the installation."

Specialist Jason Smith, a military policeman (MP) at Ft. Riley, was participating in the checkpoint on Trooper Avenue the morning of March 1, 1997. Specialist Smith was advised by another MP that when the defendant was stopped, an odor of alcohol was detected on the defendant. Specialist Smith also detected an odor of alcohol, and after waiting 15 minutes (the required alcohol deprivation time), a preliminary breath test showed that the defendant had a blood alcohol level of .09.[2] Field sobriety tests also provided evidence of impairment. The defendant was then placed in custody. After the required 20 minute deprivation time, the defendant was then given another breath test. A blood alcohol level of .097 was recorded.

Defendant, relying on State v. Deskins, 234 Kan. 529, 541, 673 P.2d 1174 (1983), argues that the authorities should have given advance notice of the checkpoint to the public. This requirement of a notice was one of 13 factors enunciated by the court in Deskins which had to be balanced to determine the

---

1. The checkpoint on Trooper Avenue was to be conducted from 12:30 a.m. to 3:00 a.m. on the morning of March 1, 1997.

2. Under K.S.A. 8–1567(a), a person is driving under the influence if the alcohol concentration in a person's blood or breath is .08 or more. That statute is assimilated under federal law for Ft. Riley pursuant to 18 U.S.C. § 13.

constitutionality of a checkpoint. However, *Deskins* is not controlling authority in federal court or on a federal reservation located within the state of Kansas.

In *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the court upheld the constitutionality of a sobriety checkpoint. In Sitz, the guidelines set forth procedures for checkpoint operations, site selection, and publicity. All vehicles were to be stopped and the drivers examined for signs of intoxication. During the checkpoint in question, 126 vehicles were stopped; only 2 were arrested for driving under the influence. 496 U.S. at 447–448, 110 S.Ct. at 2484.

The court determined that it must balance the state's interest to curb drunk driving, the degree to which the seizure advances the public interest, and the level of intrusion on an individual's privacy caused by the checkpoints in order to determine the constitutionality of the sobriety checkpoint plan. 496 U.S. at 448–450, 453–54, 110 S.Ct. at 2484–85, 2487.

The court found that there is a strong state interest in eradicating the drunk driving problem. 496 U.S. at 451, 110 S.Ct. at 2485. By contrast, the level of intrusion on motorists was found to be slight. 496 U.S. at 451–453, 110 S.Ct. at 2486–87. The court upheld the stop as advancing the public interest even though only 1.6% (2 out of 126) drivers were arrested for drunk driving. The court noted that, generally, checkpoints only result in drunk driving arrests of 1% of all motorists stopped. The court also noted that in a prior case involving checkpoints for illegal aliens, illegal aliens were found in only .12% of vehicles passing through the checkpoint. Nonetheless, the court found that such checkpoints were effective and sustained their constitutionality. 496 U.S. at 454–455, 110 S.Ct. at 2487–88.

■ No controlling authority has ever required that advance notice should be required as part of the balancing formula to determine the constitutionality of the checkpoint, and this court finds that advance notice is not required for a valid checkpoint. In the case of *United States v. Ziegler*, 831 F.Supp. 771 (N.D.Cal.1993), where a sobriety checkpoint was established outside the entrance to Fort Ord, the court held that a search at a sobriety checkpoint does not violate the Fourth Amendment to the United States Constitution when motorists are not given advance publicity of the checkpoint. 831 F.Supp. at 772. While advance publicity may be one effective measure to protect the rights of the individual, it is not an absolute requirement when, in this case, as in *Sitz*, the guidelines provide sufficient safeguards for constitutional purposes.

■ Defendant argues that the limited effectiveness of the checkpoint and that less intrusive methods are available should render the checkpoint in question an unconstitutional violation of the Fourth Amendment. Exhibit B of the government's response to the motion to suppress shows that 531 vehicles were inspected at the two checkpoints operated on Feb. 28—March 1, 1997. There were four arrests for DUI, five arrests for transporting or possession of an open container, two arrests for minor in consumption, one arrest for driving on a suspended license, and one arrest for driving without a license. The four DUI arrests constitute .753% of vehicles stopped. There were eleven alcohol related arrests, which constitutes 2.07% of vehicles stopped. Those results are in line with the results in *Sitz*, which was upheld by the court. As the court noted in *Sitz*, it is not for the courts to determine which among reasonable alternative law enforcement techniques should be employed to deal with a public danger. The choice among reasonable alternatives remains with governmental officials who have a unique understanding of, and responsibility for, limited public resources, including a finite number of police officers. *Sitz*, 496 U.S. at 453–54, 110 S.Ct. at 2487. For the same reason, the fact that the military police only stopped incoming traffic at Trooper Avenue does not render the checkpoints invalid. It is not for the court to micromanage details of checkpoint stops, or to second guess police decisions on such matters. The military police at Ft. Riley, not this court, are in a much better position to determine whether stops should be made for both lanes of traffic or only traffic in one direction, taking into consider-

ation manpower, safety, and other relevant concerns.

■ Another unique factor present in this case also argues in favor of upholding the constitutionality of this checkpoint on a military reservation. This checkpoint was not only a sobriety checkpoint, but a vehicle inspection, looking for contraband, weapons, and wrongfully appropriated military equipment. In determining if the government's interests are substantial, courts have generally deferred to decisions of the Executive Branch, especially when they relate to military and national security. For this reason, a vehicle inspection at Warren Air Force Base designed to check for government property, contraband and classified information was upheld. *United States v. Santiago,* 846 F.Supp. 1486, 1492–93 (D.Wyo.1994) (defendant arrested for DUI). Entry onto a military installation differs markedly from traveling on a public highway. A base commander may formulate such rules and regulations as are necessary for the safety and welfare of his installation. He may exclude civilians or place restrictions on their right of access to the base. *United States v. M.J.,* 716 F.Supp. 295, 297 (W.D.Ky.1989). In the *M.J.* case, the defendant's vehicle was stopped at the gate leading into Fort Knox. The defendant was arrested for DUI and possession of marijuana. As in the case now before the court, there was a sign at the entrance stating that persons and vehicles are subject to search upon entry and exit from Fort Knox and while within Fort Knox. The court held that since the signs were clearly posted, a person approaching could opt to enter or not enter. The court held that when the driver opted to enter, she should have realized that she was subject to an inspection. The court therefore upheld the checkpoint, noting the obvious need for access controls at military installations. *Id.* at 296–98.

■ This court believes that great deference should be given to law enforcement officials at Ft. Riley who conduct checkpoints. First, courts should be reluctant to intrude upon military and national security affairs. Second, there is a strong interest in the armed forces to search for contraband,

weapons, and wrongfully appropriated military equipment. Third, the entrance on Trooper Avenue clearly placed drivers on notice that persons and vehicles were subject to inspection at Ft. Riley. By entering Ft. Riley, the defendant should have realized that he was subject to be stopped for an inspection. Fourth, there is a clearly recognized need for access controls to military reservations. Commanders can opt to exclude people from the installation; likewise, he or she clearly has the authority to place restrictions on the right of access to the base. These considerations also factor strongly in this court's decision to uphold the constitutionality of the checkpoint.

Defendant also argues for suppression of the evidence because the military police did not comply with the requirements of K.S.A. 8–1001(b), which requires that a person submitting to a blood or breath alcohol test be arrested or otherwise taken into custody for any offense involving the operation of a vehicle while under the influence. K.S.A. 8–1001 is the implied consent statute in Kansas. Defendant's position is that the defendant was not under arrest when he submitted to the breath alcohol test.

■ The purpose of the Assimilative Crimes Act (ACA) is to provide a method of punishing a crime committed on government reservations in the way and to the extent that it would have been punishable if committed within the surrounding jurisdiction. The ACA fills in gaps in federal criminal law by providing a set of criminal laws for federal enclaves. *United States v. Garcia,* 893 F.2d 250, 253 (10th Cir.1989), *cert. denied,* 494 U.S. 1070, 110 S.Ct. 1792, 108 L.Ed.2d 793 (1990); *United States v. Sain,* 795 F.2d 888, 890 (10th Cir.1986). Federal courts are not required to follow specific provisions of state law which go beyond establishing the elements of an offense and the range of punishment, or which are inconsistent with federal policies expressed in federal statutes. *Sain,* 795 F.2d at 890–91. Therefore, state statutes which are procedural or regulatory are not assimilated under the ACA. *United States v. Roberts,* 845 F.2d 226, 228–29 (9th Cir.), *cert. denied,* 488 U.S. 845, 109 S.Ct. 121, 102 L.Ed.2d 95 (1988). In *Roberts,* the

court held that California's implied consent law provisions were not assimilated under the ACA since they were regulatory and procedural, and did not define a criminal offense and authorize punishment. *Id.* at 229. In the case of *United States v. Love,* 141 F.R.D. 315, 317 (D.Colo.1992), that court also held that the express consent provisions of state law were not incorporated under the ACA. Furthermore, there is a federal statute, 18 U.S.C. § 3118, which is an implied consent statute for federal jurisdictions. The statute was adopted on November 18, 1988. Thus, even if a state implied consent law could be assimilated, it would be superseded by this statute. *Id.* at 318. The court adopts the rationale and holding of these opinions, and holds that law enforcement authorities at Ft. Riley, Kansas, are governed by 18 U.S.C. § 3118, and not K.S.A. 8–1001.

The federal statute, 18 U.S.C. § 3118, provides that one who operates a motor vehicle in a federal jurisdiction consents to a test if arrested for any offense arising from such person's driving while under the influence of a drug or alcohol in such jurisdiction. As such, the wording is similar to the language of K.S.A. 8–1001(b) relied on by the defendant. Defendant argues that he was not under arrest when the test was administered.

The court finds that the proper test to be applied when determining whether a person is under arrest when the test of a person's blood, breath or urine is taken under 18 U.S.C. § 3118, is whether at that time there were some significant restraints on his or her freedom of movement which were imposed by a law enforcement official. *State v. Louis,* 240 Kan. 175, 181, 727 P.2d 483 (1986); *see Stansbury v. California,* 511 U.S. 318, 322–24, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994) (a person is in custody if there has been a formal arrest or restraint on freedom of movement of the degree associated with formal arrest).

Specialist Smith testified that following the preliminary breath test and field sobriety tests, he found probable cause to believe that the defendant was driving under the influence. He testified that the defendant was then in custody and was not free to leave. There was clearly a significant restraint on the defendant's freedom of movement. The defendant was under arrest for driving under the influence. Defendant's argument that he was somehow not under arrest prior to the taking of the breath alcohol test is without merit.

IT IS THEREFORE ORDERED that the motion to suppress is denied.