# Authority for Military Police to Issue Traffic Citations to Motorists on Bolling Air Force Base

Military police have the authority to issue citations, enforceable in federal court, to motorists who violate traffic laws on Bolling Air Force Base.

Congress has given the General Services Administration limited authority over military installations for the narrow purpose of issuing and enforcing the regulations related to motor vehicle violations.

June 5, 2000

MEMORANDUM OPINION FOR THE DEPUTY GENERAL COUNSEL
DEPARTMENT OF DEFENSE

This memorandum responds to a request from the Air Force Judge Advocate General's Office ("Air Force JAG") and the United States Attorney's Office for the District of Columbia ("U.S. Attorney's Office") concerning the authority of military police to issue citations, enforceable in federal court, to motorists who violate traffic laws on Bolling Air Force Base in the District of Columbia ("District" or "D.C.").[1] We conclude that the military police may properly issue such citations pursuant to a delegation from the General Services Administration ("GSA") of the authority GSA possesses under 40 U.S.C. §§ 318–318d to issue regulations governing GSA-controlled property and to enforce these regulations in federal courts, as provided for by Congress when it amended 40 U.S.C. § 318c in 1996.

The Air Force JAG's Office has expressed concern that this delegation procedure implies that GSA has charge and control over military bases. *See* Memorandum for HQ USAF/JAG Attn: Colonel Stucky, from 11WG/JA, William T. Burke, Captain, USAF, Assistant Staff Judge Advocate, *Re: 40 U.S.C. § 318* (Aug. 14, 1996) ("Stucky Memorandum"). Based on our review of the text of the relevant statutory provisions, the statutory scheme, and the legislative history, we conclude that, in amending 40 U.S.C. § 318c in 1996, Congress did not alter longstanding statutory provisions and place military bases under GSA's charge and control. Rather, it has given GSA limited authority over military installations for the narrow purpose of issuing and enforcing the regulations related to motor vehicle violations covered by § 318c(b)(1).

---

[1] The Air Force initially sought review of this matter by the U.S Attorney's Office *See* Letter for Rhonda C. Fields, Chief, Economic Crimes Section, Criminal Division, U.S. Attorney's Office, from Robert S Schwartz, Colonel, USAF, Staff Judge Advocate (Sept 9, 1996). The U.S. Attorney's Office determined that the legal questions presented should be forwarded to the Office of Legal Counsel for review and decision *See* Letter for Robert S. Schwartz, Colonel, USAF, Staff Judge Advocate, from Rhonda C. Fields, Chief, Economic Crimes Section, Criminal Division, U.S. Attorney's Office (Sept 17, 1996) ("Fields Letter") On behalf of your office, you have also asked us to respond to this request.

72

**I**

For approximately one year in the early 1970s, the U.S. Attorney's Office prosecuted all traffic violations occurring at military installations within D.C. before United States Magistrates in federal district court. *See* Letter for Martin R. Hoffman, General Counsel, Department of Defense, from Earl J. Silbert, United States Attorney at 1 (May 31, 1974) ("Silbert Letter"). These prosecutions relied on the Assimilative Crimes Act, 18 U.S.C. § 13 (Supp. IV 1998) ("ACA"), which adopts for each federal enclave the criminal law of the state within which the enclave is located. Were the ACA applicable in the District of Columbia, violations of local D.C. law on federal enclaves in the District would become federal crimes that could be prosecuted in federal court. After closer review of the applicable law, however, the U.S. Attorney concluded in 1974 that the ACA did not permit such an incorporation of local law for federal enclaves in the District. *See* Silbert Letter at 1. According to the U.S. Attorney, without operation of the ACA, a federal magistrate had no jurisdiction over traffic violations. *Id.* The U.S. Attorney also concluded that D.C. Superior Court would offer an alternate forum for such prosecutions or that federal legislation could be enacted specifically to govern military installations. *Id.* at 2.

In a 1984 opinion concerning the investigative jurisdiction of the Federal Bureau of Investigation in the District of Columbia, we addressed whether federal enclave jurisdiction extended to federal buildings and installations in the District. *See* Memorandum for Stephen S. Trott, Assistant Attorney General, Criminal Division, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel *Re: FBI Investigative Jurisdiction in Washington, D.C.* at 1 (Feb. 7, 1984) ("Olson Memo"). The U.S. Attorney's Office — consistent with the Silbert Letter — did not argue that the ACA applied to federal sites in the District. The issue was whether title 18 offenses applicable in the " 'special maritime and territorial jurisdiction of the United States' " applied in the District. *See id.* at 8 n.7 (quoting 18 U.S.C. § 7). In concluding that 18 U.S.C. § 7 did not confer jurisdiction over federal crimes committed on federal sites in the District, we observed that there were two reasons why neither 18 U.S.C. § 7 (the federal enclave statute) nor 18 U.S.C. § 13 (the ACA) — "related" provisions, Olson Memo at 7 — applied in the District. First, the ACA, on its face, incorporates *state* offenses, not acts " 'made penal by a law of Congress,' " such as the D.C. Code. *See id.* at 8 (quoting 1984 version of 18 U.S.C. § 13). Second, the rationale for both the federal enclave jurisdiction provision and the ACA "is to fill the jurisdictional gap created when the federal government acquires, and a State cedes, land." *Id.* In the case of the District of Columbia, because the D.C. Code functions as the equivalent of state law, no such gap exists. *Id.* Thus, based on an examination of the legislative history, case law, and the structure and legislative history of the criminal code of which both the ACA and the federal enclave jurisdiction statute were

part, we concluded that Congress intended to exclude the District of Columbia from the scope of federal enclave jurisdiction. *Id.* at 4–10. Consequently, the ACA could not support federal court prosecution of violations of the D.C. Code on federal enclaves in the District of Columbia. *Id.* at 8. A footnote in that opinion noted:

> We are informed that the military authorities in the District of Columbia intend to employ federal magistrates to preside over prosecutions of civilians who commit offenses on military reservations within the District. To the extent these prosecutions would be based on federal enclave jurisdiction . . . rather than . . . federal criminal jurisdiction . . . or territorial jurisdiction . . . our conclusion indicates that such prosecutions would be unauthorized.

*Id.* at 13 n.11 (citations omitted).

According to conversations with the GSA General Counsel's Office in December 1998, GSA began, in the 1980s, receiving requests from military components for delegation of authority to issue and enforce traffic regulations for military installations. *See* Telephone Interview with Scarlett D. Grose, Assistant General Counsel, Real Property Division, GSA (Dec. 8, 1998) ("Grose Interview"); Telephone Interview with Harmon Eggers, Acting Associate General Counsel, Real Property Division, GSA (Dec. 3, 1998). In 1981 GSA delegated authority to the Department of Defense ("DoD") pursuant to which DoD issued DoD Directive No. 5525.4, entitled *Enforcement of State Traffic Laws on DoD Installations* ("DoD Directive"). *See* DoD Directive No. 5525.4 (Nov. 2, 1981), *reprinted in* 32 C.F.R. pt. 634, app. C (1997). That directive was issued pursuant to policies "for the enforcement, on DoD military installations, of those state vehicular and pedestrian traffic laws that cannot be assimilated" under the ACA. *See* 32 C.F.R. § 210.1. The directive mandates that "[a]ll persons on a military installation shall comply with the vehicular and pedestrian traffic laws of the state in which the installation is located," 32 C.F.R. pt. 634, app. C ¶ C(2); delegates to "installation commanders of all DoD installations in the United States and over which the United States has exclusive or concurrent legislative jurisdiction . . . the authority to establish additional vehicular and pedestrian traffic rules and regulations," *id.* ¶ C(3); and establishes penalties set forth in 40 U.S.C. § 318c for such violations, 32 C.F.R. pt. 634, app. C ¶ C(4).[2] The delegation from the GSA states that the GSA "authorizes the Secretary of Defense to assist in controlling vehicular and pedestrian traffic on military installations in the United States"

---

[2] 40 U S C § 318c(a) provides that "whoever violates any rule or regulation promulgated pursuant to section 318a .    shall be fined not more than $50 or imprisoned not more than thirty days, or both " 40 U.S C. § 318a authorizes the GSA to "to make all needful rules and regulations for the government of the property under [its] charge and control, and to annex to such rules and regulations such reasonable penalties, within the limits prescribed in section 318c of this title, as will ensure their enforcement."

pursuant to authority vested in the GSA by the Federal Property and Administrative Services Act of 1949 ("FPASA") and the Act of June 1, 1948. *Id.* (Enclosure No. 1). Neither the DoD Directive nor the delegation from the GSA explains why GSA delegation is either appropriate or necessary in order for the DoD to issue such regulations.

In 1996, the U.S. Attorney's Office called our 1984 opinion to the attention of the Air Force and informed the Air Force that it would no longer prosecute certain violations without a determination by our Office that federal jurisdiction over those violations was proper. *See* Fields Letter.

## II

The GSA has general authority under 40 U.S.C. §§ 318–318d to issue and enforce regulations for federal property and thereby has general responsibility for the protection and policing of that property. This includes the authority "to make all needful rules and regulations for the government of the property under [its] charge and control." *See* 40 U.S.C. § 318a. Under this authority, the GSA has issued regulations governing such matters as vehicular and pedestrian traffic, drug and alcohol use, operation of gambling devices, and collection of private debts on GSA-controlled property. *See* 41 C.F.R. §§ 101–20.300 to 101–20.315 (1997). Violations of these regulations are subject to fines of not more than $50 or imprisonment for not more than thirty days, or both. *See* 40 U.S.C. § 318c; 41 C.F.R. § 101–20.315.

Under the same statutory scheme, GSA is authorized to "appoint uniformed guards [of the GSA] as special policemen . . . for duty in connection with the policing of all buildings and areas owned and occupied by the United States and under the charge and control of the Administrator." 40 U.S.C. § 318(a). The duties of these officers include enforcing regulations promulgated under § 318a, including traffic regulations where applicable. Section 318 continues:

> Special policemen appointed under this section shall have the same powers as sheriffs and constables upon property referred to in subsection (a) . . . to enforce the laws enacted for the protection of persons and property, and to prevent breaches of the peace, to suppress affrays or unlawful assemblies, and to enforce any rules and regulations promulgated by the [GSA] for the property under [its] jurisdiction; except that the jurisdiction and policing powers of such special policemen shall not extend to the service of civil process.[3]

---

[3] The powers held by sheriffs and constables under the common law include "the power to prevent and detect crime, to arrest criminals, and to protect life and property." *Holland v. Commonwealth*, 502 S E.2d 145, 148 (Va. Ct App. 1998). One state court has concluded that

Continued

*Id.* § 318(b). According to the GSA General Counsel's office, violations of regulations under this provision rarely give rise to prosecutions — usually, offenders are simply escorted off the property. *See* Grose Interview at 2. When they are prosecuted, violators are tried before a federal magistrate. *Id.* The special police officer's authority extends only to the boundary of the federal property, and officers are not currently permitted to exercise any authority on the surrounding property.

This statutory authority of GSA, however, does not encompass military installations. The GSA's policing and protection power extends only to "the government of the property under [its] charge and control." 40 U.S.C. § 318a. While this limitation is not further defined in that statute, 40 U.S.C. § 285 (1994) defines "Buildings under control of Administrator of General Services" as follows:

> All courthouses, customhouses, appraiser's stores, barge offices, and other public buildings outside of the District of Columbia and *outside of military reservations*[4] which have been purchased or erected, or are in course of construction, or which may be erected or purchased out of any appropriation under the control of the Administrator of General Services, together with the site or sites thereof, are expressly declared to be under the exclusive jurisdiction and control and in the custody of the Administrator of General Services . . . .

*Id.* (emphasis added).[5] Both the GSA and the representatives of the Air Force agree that the military installation is not within GSA's jurisdiction for purposes

---

the common law power of the sheriff to make arrests without warrant for felonies and for breaches of the peace committed in his presence . . [is] so widely known and so universally recognized that it is hardly necessary to cite authority for the proposition . . . [Thus], [u]nless the sheriff's common law power to make warrantless arrests for breaches of the peace committed in his presence has been abrogated, it is clear that a sheriff *(and his deputies) may make arrests for motor vehicle violations which amount to breaches of the peace committed in [his] presence*

*Commonwealth v Leet,* 641 A.2d 299, 303 (Pa. 1994) (citation omitted); *see also Prosser v. Parsons,* 141 E 2d 342, 345 (S.C 1965) (common law power of sheriff and constable to arrest without warrant felons or persons reasonably suspected of having committed a felony and those who had committed a misdemeanor in his presence which amounted to a breach of the peace "is not applicable to any violation of the criminal laws of this State committed within the view of such an officer ") (citing 5 Am. Jur. (2d) Arrest, Sec. 24, *et seq.*); *Commonwealth v Taylor,* 677 A.2d 846 (Pa. Super. Ct 1996) (constables possess power to make warrantless arrests for felony, violations of drug laws).

[4] Although there is no definition in title 40 for "military reservation," "reservation" is defined in title 16 (which concerns conservation), for purposes of title 16, chapter 12, as follows:

"[R]eservations" means national forests, tribal lands embraced within Indian reservations, military reservations, and other lands and interests in lands owned by the United States, and withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws; also lands and interests in lands acquired and held for any public purposes; but shall not include national monuments or national parks.

16 U S C § 796(2) (1988); *see also Black's Law Dictionary* 1307 (6th ed. 1990) ("A reservation is a tract of land, more or less considerable in extent, which is by public authority withdrawn from sale or settlement, and appropriated to specific public uses; such as parks, military posts, Indian lands, etc ")

[5] This provision is based on a similar provision in the Sundry Civil Appropriation Act of July 1, 1898, placing the control of these buildings in the Department of Treasury. As the debate on this provision indicates, the first version of this provision had neither the exceptions for "the District of Columbia" nor "military reservations."

of 40 U.S.C. §§ 318–318d. On its face, then, the GSA is not an obvious source of authority to police military installations in the District of Columbia.

In internal memoranda responding to questions raised by the U.S. Attorney's Office about authority for federal prosecution of motor vehicle offenses on military installations in the District of Columbia, the Air Force suggests that GSA's statutory authority to extend its rules to property under the control of other departments or agencies of the United States may be applicable. *See* Memo for Record, from William T. Burke, Captain, USAF, Assistant Staff Judge Advocate, *Re: 40 U.S.C. § 318 — Enforcement of Local Traffic Laws on Bolling AFB* (Aug. 15, 1996) ("Burke Memo"). According to the Burke Memo, the predecessor statute to 40 U.S.C. § 318, enacted in 1948, "authorized the Administrator of Federal Works to make all needful rules and regulations for the property under the charge and control of the Federal Works Agency [("FWA") the predecessor to the GSA]. Furthermore, section 3 of that statute authorized the Administrator to *extend* such rules to property of the United States under the control of other departments or agencies of the United States." Burke Memo at ¶ 2. As currently codified, this section provides as follows:

> Upon the application of the head of any department or agency of the United States having property of the United States under its administration and control, the Administrator of General Services or officials of the Administration . . . are authorized to detail any such special policemen for the protection of such property and if he deems it desirable, to extend to such property the applicability of any such regulations and to enforce the same as set forth herein
>
> . . . .

40 U.S.C. § 318b. This provision empowers GSA to provide policing of military installations outside GSA's charge and control only if GSA details its own officers to provide the policing services. In this case, however, it is not the GSA special police who are policing the military installations, but rather the military's own police. Section 318b, then, does not provide a complete basis for GSA to delegate to DoD policing authority for property under DoD's (rather than GSA's) charge and control.

---

*See* 31 Cong. Rec 3506 (1898). An amendment was proffered exempting the District of Columbia *Id.* Upon the reading of the bill, Senator Hawley pointed out the problem that the "provision puts the entire control of [a post office on a military reservation] in the hands of the Treasury Department. The supreme control of it has to be in the commanding officer really — the final control." *Id* The following brief colloquy ensued

> [Sen ] Allison The Senator will see that the provision as it came from the House placed all public buildings under the control of the Secretary of the Treasury We have inserted the words "outside the District of Columbia " How would it do to say "outside of the District of Columbia and military reservations?"
>
> [Sen ] Hawley· I think there would be less likely to be any controversy in that case.

*Id* The amendment was then adopted. *See* 31 Cong Rec 5604 (1898) (Statement of Conference Report)

The Burke Memo suggests a mechanism for filling the gap. It notes that "Section 103(d) [of FPASA, the 1949 Act that created the GSA] authorized the newly created Administrator of the GSA 'to delegate and to authorize successive redelegation of any authority transferred to or vested in him by this Act to . . . the head of any other Federal Agency.' " Burke Memo at ¶ 3. GSA could delegate both the authority to provide protection and the authority to appoint special police to DoD for property under DoD's charge and control.[6] *Id.* at ¶ 4.

GSA has relied on a similar delegation procedure in other contexts where similar authority concerns have been raised, such as providing security for the National Security Agency ("NSA"). According to the GSA, it "does not have charge and control over property on military reservations," which includes property of the NSA. *See* Letter for George Fruchterman, Legislation and Regulatory Counsel Division, Office of General Counsel, NSA, from Scarlett D. Grose, Assistant General Counsel, Real Property Division, GSA (Oct. 9, 1997) ("Grose Letter"). Nevertheless, the GSA concluded that it could delegate its statutory authority "upon application by the head of the agency . . . to detail GSA special police to NSA for the protection of property under NSA's charge and control" through "[s]ection 205(d) of the [FPASA]" which "authorizes the Administrator to delegate any authority transferred or vested in him under [FPASA] to the head of any other Federal agency." *Id.* at 1. By a delegation of its authority to protect property under NSA's charge and control along with its authority to appoint special police under 40 U.S.C. § 318, GSA could confer on NSA the authority "to appoint special police for the protection of property under [NSA's] charge and control." Grose Letter at 2.

Although § 205 of FPASA, 40 U.S.C. § 486 (1994), may have offered authority for delegation by GSA to DoD prior to the 1996 amendment, now there is a statutory provision directly providing for the delegation of authority in this specific circumstance by GSA to DoD. As a result, reliance on § 486 is no longer needed. In 1996, Congress amended 40 U.S.C. § 318c by adding the following provision:

> (b)(1) Whoever violates any military traffic regulation shall be fined an amount not to exceed the amount of the maximum fine for a like or similar offense under the criminal or civil law of the State, territory, possession, or district where the military installation in which the violation occurred is located, or imprisoned for not more than 30 days, or both.

---

[6] Section 103 of the FPASA transfers all functions of the FWA to the GSA Section 205(d) of the FPASA, now codified at 40 U S.C § 486(d), authorizes the new agency's Administrator to delegate and redelegate "any authority transferred to or vested in him by [FPASA]" to any official in the GSA or the head of any other Federal agency. Section 205(e) of FPASA, now § 486(e), grants the GSA Administrator similar authority to delegate functions to heads of other Federal agencies It appears to us that § 486(e) is the more appropriate source of authority for the delegation at issue here

> (2) For purposes of this subsection, the term "military traffic regu-
> lation" means a rule or regulation for the control of vehicular or
> pedestrian traffic on military installations that is promulgated by
> the Secretary of Defense, or the designee of the Secretary, under
> the authority delegated pursuant to section 318a of this title.

40 U.S.C. § 318c(b).[7] This amendment provides the DoD with independent statu-
tory authority to issue rules for regulating traffic on base, the violations of which
would be federal offenses, so DoD need no longer rely on the delegation authori-
ties in § 486, provided it obtains GSA authorization.

On its face, it is unclear from the statutory scheme of 40 U.S.C. §§ 318–318d
why Congress would direct the DoD to turn to GSA for this authority. Nor does
the legislative history of this amendment aid in explaining why Congress utilized
this mechanism for authorizing DoD to issue these regulations. The provision was
added by an amendment contained in the National Defense Authorization Act for
Fiscal Year 1997, Pub. L. No. 104–201, § 1067, 110 Stat. 2422, 2654 (1996).
On June 25, 1996, the text of the provision that was eventually enacted first
appears, as a bill, S. 1745, 104th Cong. (1996), with no discussion accompanying
its appearance. *See* 142 Cong. Rec. 15,198 (1996). The next day, Senator
Hutchison offered the provision as amendment No. 4319 to the defense authoriza-
tion bill with the stated purpose, "To increase penalties for certain traffic offenses
on military installations" and reported that the amendment was cleared by the
other side, and the amendment passed soon after. *See* 142 Cong. Rec. 15,386
(1996). The title of the provision as introduced suggests that the purpose of the
amendment was to *increase* penalties, not to give DoD authority to issue and
enforce regulations regarding traffic offenses. The Conference Report on H.R.
3230, which replaced the competing House and Senate versions of the defense
authorization bill, on the other hand, states only that the Senate version "contained
a provision (sec. 1079) that would *allow* the Secretary of Defense or his designee
to promulgate rules or regulations concerning traffic offenses committed on mili-
tary installations and apply the surrounding community's authorized punishments
to those offenses in specified circumstances. . . . The House recedes on this."
H.R. Conf. Rep. No. 104–724, at 793 (1996), *reprinted in* 1996 U.S.C.C.A.N.
2948, 3300 (emphasis added). No mention is made in the conference report about
the fact that the provision, according to its original title, purported only to increase
penalties; rather, the provision is now entitled "Assimilative crimes authority for
traffic offenses on military installations (sec. 1067)," *id.*, and the report suggests

---

[7] The Air Force JAG's Office and the U S Attorney's Office were concerned that the reference to "state vehicular
and pedestrian traffic laws" in the DoD Directive would not include assimilation of laws in the District. *See* Memo-
randum for HQ USAF/JG, Attn. Colonel Stucky, from 11WG/JA, Robert S. Schwartz, Colonel, USAF, Staff Judge
Advocate, *Re: Applicability of 40 U S C. § 318 to the District of Columbia* at ¶ 4 (Sept. 26, 1996). This concern
is presumably mooted by the language of 40 U S C § 318c(b)(1) which refers expressly to "district" laws as well
as state and other local laws

it was intended to "allow" the Secretary to issue these rules and regulations.[8] The National Defense Authorization Act for Fiscal Year 1997, of which this provision was part, became law on September 23, 1996.

Although the legislative history of this amendment sheds no light as to why Congress adopted this means of giving the military authority to issue regulations governing traffic violations on military bases, a transmittal to this Office from DoD's Office of General Counsel includes a two-page request from DoD to Congress in 1996 for a similar provision and an accompanying section-by-section analysis. This analysis suggests that the request for this amendment was prompted by federal court decisions, *see, e.g., United States v. Golden*, 825 F. Supp. 667 (D.N.J. 1993), that the ACA does not permit the assimilation of non-criminal state offenses on federal installations. *See* Fax Transmission for Robert Delahunty, Special Counsel, Office of Legal Counsel, from Nicole M. Doucette, Office of General Counsel, Department of Defense, *Re: Enforcement of Traffic Violations on Military Installations in DC* (Apr. 17, 1997) ("Doucette Fax"). The DoD version included in this request was modified before it was introduced in Congress; unlike the version that was introduced, the DoD version references the ACA and increases the fines for such violations to $1000. Nevertheless, the section-by-section analysis's explanation of the delegation procedure is consistent with the approach Congress adopted in the enacted law. It sets forth the procedure as follows:

> Where state law cannot be assimilated, persons may be prosecuted under section 318c of title 40, United States Code. This section authorizes prosecution for a violation of a regulation to control Federal property promulgated by the Administrator of the General Services Administration under section 318a of title 40. With respect to military installations, the Administrator has delegated the authority to promulgate regulations to the Secretary of Defense, who has in turn delegated the authority to the commanders of military installations. Under this authority, the military services have by joint regulation adopted state traffic laws. Installation commanders may issue additional regulations.

*See* Draft Legislative Proposal *in* Doucette Fax at 5. While this request does not provide the legal rationale for turning to the GSA for delegation of authority over traffic law on military bases, and does not examine whether GSA has or should be given charge and control over the military installations, the analysis does sug-

---

[8] Although the 1996 amendment does not directly provide for an increase in penalties, it does permit both criminal or civil prosecution of the offense based on the law of the surrounding jurisdiction, thus potentially broadening the scope and severity of available penalties *See* 40 U S C § 318c(b)(1) (violations "shall be fined an amount not to exceed the amount of the maximum fine for a like or similar offense under the criminal or civil law of the State, territory, possession, or district where the military installation" is located)

gest that Congress may have opted for the somewhat unwieldy procedure of directing the GSA to delegate to the Secretary of Defense the authority to issue the regulations, who in turn redelegates this authority to the installation commanders, who are then responsible for enforcing these motor vehicle regulations on the installations, based on the suggestion of the DoD.[9] More importantly, however, the amendment also establishes that violations of these regulations are federal offenses regardless of whether they may or not be otherwise assimilated under the ACA.

It appears from some of the correspondence that has been forwarded to us, as well as conversations subsequent to the 1996 amendment, that the Air Force is concerned that adopting the procedures set forth in the 1996 amendment to the GSA policing and protection authority provisions with regard to Bolling Air Force Base would imply that with that amendment Congress placed military installations under GSA's charge and control. *See* Telephone Interview with Major Mark Strickland, Legal Counsel's Office, Bolling Air Force Base (Dec. 3, 1998); Stucky Memorandum at ¶ 3. We consider this to be an implausible reading of the statutory scheme. It would require reading the 1996 amendment effectively to repeal the exception in § 285 for military reservations. It is unlikely that Congress would seek to effect a wholesale repeal of § 285, placing public buildings and surrounding sites on military reservations under GSA's charge and control, with no discussion of the implications of such a change. Indeed, such a reading would be contrary to general principles of statutory interpretation. *See* 1A Norman J. Singer, *Sutherland Statutory Construction* § 23.10 (5th ed. 1993) ("The presumption against implied repeals is founded upon the doctrine that the legislature is presumed to envision the whole body of the law when it enacts new legislation. Therefore, the drafters should expressly designate the offending provisions rather than leave the repeal to arise by implication from the later enactment . . . ."). Because there is no evidence in the legislative history of any intent to repeal any part of § 285, we do not read the 1996 amendment to 40 U.S.C. § 318 as an implied repeal of the exception in § 285 pertaining to military reservations: "[I]n the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable or if the later act covers the whole subject of the earlier one and is clearly intended as a substitute." *Id.* § 23.09. Section 318 of title 40, as amended in 1996, and § 285, although intuitively inconsistent, are reconcilable, obviating any need to find an implied repeal of § 285. The 1996 amendment to § 318 may be read, consistent with § 285, as a limited grant of authority to GSA over military installations for the narrow purpose of regulating traffic on the installations. The 1996 amendment gives GSA no additional authority over military property. It may be, however, that because the existing

---

[9] Perhaps Congress, in view of the history of delegations by GSA, selected the procedure that most closely matched the practice, even if that procedure was unwieldy.

delegation is based on the previous statutory scheme, a new delegation based on the 1996 amendment to § 318 is required.[10]

## III

In the 1996 amendment to 40 U.S.C. §§ 318–318d, Congress gave the Secretary of Defense the power to issue regulations to enforce local traffic law on bases and enforce such violations as federal offenses. The 1996 amendment mandates, however, that in order to issue and enforce these regulations, the Secretary of Defense must initially obtain an appropriate delegation of authority from the GSA. GSA is authorized by its governing statutes to issue regulations for federal property under its charge and control; appoint special police officers to enforce those regulations; and impose certain statutorily limited penalties for violations of these regulations which are rendered federal offenses. Although the legislative history of the 1996 amendment offers little insight into the underlying congressional intent, consistent with general principles of statutory interpretation and the statutory scheme, we conclude that in amending § 318c in 1996, Congress did not intend to change the statutory definition of property under GSA charge and control. Rather, Congress granted GSA authority over military installations for the sole purpose of regulating traffic on the base and directed it to delegate this authority to the Secretary of Defense. The traffic violations may then be prosecuted pursuant to the DoD's regulations. Adopting such a procedure does not place military installations such as Bolling Air Force Base under GSA's authority

---

[10] Air Force personnel have also expressed concerns that any such traffic enforcement actions taken by the military police against civilians may violate the Posse Comitatus Act ("PCA"). We do not believe that these concerns are warranted. The PCA provides as follows:

Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1385 (1994). The weight of authority indicates that the detention and arrest of civilians by military police for on-base violations of civil law is not prohibited by the PCA. *See United States v Banks*, 539 F.2d 14, 16 (9th Cir. 1976) (affirming authority of military police to detain and arrest civilian for heroin possession on base and turn over to civilian authorities, holding "[PCA] does not prohibit military personnel from acting upon on-base violations committed by civilians"); *United States v. Dillon*, 983 F. Supp. 1037 (D. Kan. 1997) (upholding DUI conviction subsequent to arrest on military base); *Eggleston v. Dep't of Revenue, Motor Vehicle Div.*, 895 P.2d 1169, 1170 (Col. Ct. App 1995) (PCA does not prohibit military personnel from acting upon criminal violations committed by civilians on military base "because the power to maintain order, security, and discipline on a military facility is necessary for military operations"); *Municipality of Anchorage v King*, 754 P.2d 283 (Alaska Ct. App. 1988) (holding no violation of PCA where military police arrested civilian at entry to base for DUI and turned him over to civilian authorities) Although never addressing the specific question of issuing traffic tickets and summonses, we have in the past "conclude[d] that the Posse Comitatus Act does not restrict the use of military police on a military reservation to maintain order by apprehending civilians who commit crimes on the reservation." *Law Enforcement at San Onofre Nuclear Generation Plant*, 1 Op O.L.C. 204, 209 (1977) (citing prior OLC opinions), *see also Use of Military Personnel to maintain Order Among Cuban Parolees on Military Bases*, 4B Op O.L.C. 643, 646 (1980) ("In interpreting the applicability of the prohibition of the Posse Comitatus Act to the use of military personnel, the Department of Justice and the Department of Defense generally have been careful to distinguish between the use of such personnel on military bases, on the one hand, and off military bases on the other."). Even if such activities might otherwise be prohibited by the PCA, moreover, in the 1996 amendment, Congress expressly authorized the Secretary of Defense to obtain authority for enforcing traffic control on bases, thereby arguably creating an exception to any posse comitatus problems.

except for the narrow purpose contemplated by the statute of issuing motor vehicle regulations. In order to ensure that the current delegation is proper, we recommend that the Secretary of Defense obtain a new delegation from GSA reflecting 40 U.S.C. § 318c, as amended, and issue an updated directive.

WILLIAM MICHAEL TREANOR
*Deputy Assistant Attorney General*
*Office of Legal Counsel*