**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Victoria Link HERNANDEZ, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Katie Laretta SMITH, Defendant-Appellant.**

Nos. 83–5257, 83–5258.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 2, 1984.

Decided Aug. 6, 1984.

Roger W. Haines, Jr., Asst. U.S. Atty., argued, Peter K. Nunez, U.S. Atty., John A. Houston, Asst. U.S. Atty., on the brief, San Diego, Cal., for plaintiff-appellee.

Frank M. Murphy, III, San Diego, Cal., Helen DeJoice Fortson, Chula Vista, Cal., for defendant-appellant.

Before WALLACE, SCHROEDER, and NELSON, Circuit Judges.

SCHROEDER, Circuit Judge.

Appellants Smith and Hernandez appeal their convictions under 8 U.S.C. § 1324(a)(2) (1982) of conspiracy to transport illegal aliens and aiding and abetting the transportation of illegal aliens. They contend that the district court should have suppressed evidence that military policemen discovered when they stopped appellants' vehicle at a temporary checkpoint inside Camp Pendleton, California.

The issue presented is a narrow one: whether a stop conducted at a clearly visible temporary checkpoint pursuant to a routine inspection of all vehicles for illegal aliens on a military base is an unreasonable seizure under the fourth amendment. We conclude that no unreasonable seizure occurred and that the district court properly denied the suppression motion. This result is compelled by the United States Supreme Court decisions in *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), and *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

## FACTS

Camp Pendleton is a Marine base located forty miles north of San Diego. Interstate 5, a major highway leading from the Mexican border, passes on an easement through Camp Pendleton. The San Clemente checkpoint, the permanent checkpoint on Interstate 5 upheld by the Supreme Court in *Martinez-Fuerte*, is located roughly midway between Camp Pendleton's southern and northern boundaries.

Because of Camp Pendleton's proximity to Interstate 5, it has become an alternative route for illegal aliens seeking to avoid the San Clemente checkpoint. This factor was taken into account by Camp Pendleton's commanding general when he established the temporary checkpoint system:

> ... to insure, among other things, that the command is properly equipped, that personnel are present, fit and ready for duty, that vehicles operated on the Base are safe, to locate and confiscate unlawful weapons and other contraband, including illicit drugs, and to reduce or eliminate the threat to the security of the Base caused by the presence of illegal aliens.

In his monthly directive authorizing the checkpoints, the commanding general noted:

> five to ten, or more illegal aliens are found on Base nearly every day, apparently attempting to avoid the Border Patrol checkpoint on I-5, which traverses

the Base in a north-south direction. Alien smugglers know that the Border Patrol checkpoint can be avoided by using Camp Pendleton's roads for their illicit purposes. There have been instances of alien smugglers gaining access to the Base by stealing bumper stickers or by buying used cars with unexpired military bumper stickers. The presence of illegal aliens, and alien smugglers, some of whom are armed, constitutes an obvious and substantial threat to the security of the Base. Large quantities of firearms, classified equipment and documents, and pilferable supplies are located on the Base. A nuclear power plant is located on an easement on this Base. It is a potential target of terrorist activities.

Statistics from military police records show that in 1981, 1,653 illegal aliens were apprehended at the checkpoints; in 1982, 1,395 illegal aliens were apprehended; and from January through June of 1983, there were 1,371 illegal aliens apprehended.

Pursuant to the commanding general's directive, the Base provost marshal selected the sites for each temporary checkpoint in advance, but kept that information secret from the military police (MPs) until the day of the checkpoint. The checkpoints were denominated in accord with their primary purpose. The checkpoint in the present case, for example, was listed as an "alien checkpoint." Each checkpoint remained stationary for between one and one-half and three hours. During that period, all vehicles approaching the checkpoint were stopped. The checkpoints were operated by uniformed MPs and consisted of portable signs, traffic cones, traffic control "devices," and portable light equipment. The checkpoints were completely portable; when they changed location, nothing remained.

The checkpoint where appellants were stopped was located on Basilone Road, a major intrabase connector that runs north-south through Camp Pendleton for approximately twenty-five miles. The checkpoint was directly across from Deer Park, an unrestricted area enclosed by a fence. At that point, Basilone Road traverses rural, hilly terrain. The checkpoint, however, was on a straightaway portion of the road and could be seen clearly for up to one mile in both directions.

The MPs placed two signs fifty to sixty yards in front of the Basilone Road checkpoint: one said "military police checkpoint ahead," and the second, a digital speed sign, said, "speed, 25 miles an hour." From that point bright orange traffic cones funneled traffic through the checkpoint. In addition to the seven or eight MPs operating the checkpoint, at least three specially marked military police vehicles were parked there.

On May 19, 1983, at approximately 7:20 a.m., appellants drove a white van bearing a Camp Pendleton base decal into the Basilone Road checkpoint. While the van was fifth or sixth in line an MP approached to tell the occupants that an inspection was underway. When the MP looked at the van's driver, Smith, he spied several arms and legs protruding from a blanket between Smith and her passenger, Hernandez. He then asked Smith to get out of the van and to open the back door. She did so without protest and the MP discovered nine illegal aliens inside. The parties do not dispute that if the stop at the Basilone Road checkpoint was lawful, evidence obtained as a result of the stop is admissible. The only question we decide, therefore, is whether a stop under these circumstances constitutes an unreasonable seizure.

## DISCUSSION

In *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Supreme Court considered the constitutionality of a Border Patrol stop conducted at the permanent immigration checkpoint on Interstate 5 near San Clemente. The Court acknowledged that even brief checkpoint stops are seizures within the meaning of the fourth amendment. *Id.* at 556, 96 S.Ct. at 3082. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975). The Court concluded, however, that given

the public interest in policing the entry of illegal aliens and the minimal intrusion on privacy caused by the stop, the seizure was constitutional even absent a reasonable suspicion about a vehicle's occupants. *Id.* 428 U.S. at 556–60, 96 S.Ct. at 3082–84. In so holding, the Court emphasized that the procedure in question was routinely and evenly applied to all vehicles; the permanent checkpoint involved little officer discretion and was not likely to result in abusive or harassing stops; and the appearance of authority of the officers manning the checkpoint would allay the concerns of lawful travelers. *Id.* at 558–59, 96 S.Ct. at 3083.

All of the factors stressed in *Martinez-Fuerte* are present in this case. The primary purpose of the stop was the same as in *Martinez-Fuerte*. The commanding general's directive required the MPs to stop all vehicles and the MPs exercised no discretion over the checkpoint's placement or its operation. Moreover, the checkpoint's visibility, appearance, and the presence of numerous MPs in uniform communicated to motorists that the stop was officially authorized. Finally, the stop itself involved a minimal intrusion. No question is raised here about the legality of a subsequent search. *Compare United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975).

Appellants' attempts to distinguish *Martinez-Fuerte* only emphasize its applicability to the present case. First, appellants contend that a temporary checkpoint is more like a roving patrol than a permanent checkpoint and should be disallowed under *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). In *Brignoni-Ponce*, the Supreme Court held that roving Border Patrol stops of vehicles to check for illegal aliens must be supported by reasonable suspicion. *Id.* at 881, 884, 95 S.Ct. at 2580, 2581. The Court there was concerned with the "broad and unlimited discretion" roving patrols exercised in stopping vehicles. *Id.* at 882, 95 S.Ct. at 2581. The result was to subject border area residents, particularly those of apparent Mexican ancestry, to "potentially

unlimited interference with their use of the highways." *Id.* See also *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (roving patrol searches unconstitutional).

The concerns expressed in *Brignoni-Ponce* are not present here. The MPs exercised no discretion over which vehicles to stop because they stopped all vehicles. No particular group of people was subjected to more frequent or harassing stops. There is no evidence that the Basilone Road checkpoint, or the Camp Pendleton checkpoint system in general, interfered unduly with legitimate Base traffic. See *Martinez-Fuerte*, 428 U.S. at 559, 96 S.Ct. at 3083.

*United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), decided the same day as *Brignoni-Ponce*, provides another distinction between roving patrols and authorized checkpoints. In *Ortiz*, the Court noted that the circumstances surrounding a roving patrol stop are more intrusive than a checkpoint stop:

> Roving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.

*Id.* at 894–95, 95 S.Ct. at 2587–88. *Accord Martinez-Fuerte*, 428 U.S. at 558, 96 S.Ct. at 3083.

The Basilone Road stop took place in the morning on a well traveled road. Motorists driving into the checkpoint could observe that it was accompanied by numerous indications of authority, including the signs and military police vehicles, as well as the presence of MPs in uniform. Moreover, as motorists drove into the checkpoint line, they could see that all vehicles were being stopped. Consequently, the intrusiveness of the Basilone Road checkpoint bore little resemblance to a roving patrol stop.

■ Appellants next contend that a temporary checkpoint is distinguishable from

the *Martinez-Fuerte* checkpoint because it has no permanent structures, and because it operates only infrequently at any particular location. They argue, therefore, that because motorists can have no advance warning about the checkpoint's location and operation, a stop at a temporary checkpoint is more intrusive than a stop at a permanent checkpoint. We note first that many of the checkpoints in southern California operate less than 100 percent of the time with few, if any, permanent structures, yet have been treated as permanent checkpoints. *See United States v. Vasquez-Guerrero,* 554 F.2d 917 (9th Cir.), *cert. denied,* 434 U.S. 865, 98 S.Ct. 200, 54 L.Ed.2d 141 (1977); *United States v. Baca,* 368 F.Supp. 398 (S.D.Cal.1973) (description of checkpoints in southern California). Moreover, the Court in *Martinez-Fuerte* emphasized the routine nature of the stops and the absence of officer discretion, not the presence of a permanent structure. *See* 428 U.S. at 559, 96 S.Ct. at 3083. Finally, any motorist not familiar with an area can be surprised by a stop even at a checkpoint with permanent structures. Surprise at the existence of a checkpoint does not turn a checkpoint into a roving patrol.

More important, the Supreme Court has, since *Martinez-Fuerte,* indicated that the distinctions appellants draw between a temporary checkpoint and a permanent checkpoint are not material. In *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Court held that a patrolman could not conduct a random stop of a vehicle to check its license and registration without reasonable suspicion that the vehicle was unlicensed or unregistered. *Id.* at 650, 99 S.Ct. at 1394. As in *Brignoni-Ponce,* the Court was concerned that random stops allowed the officers unlimited discretion and could cause "substantial anxiety." *Id.* at 657, 99 S.Ct. at 1398. The Court, however, expressly approved the use of open roadblocks to question all vehicles:

> This holding does not preclude the State of Delaware or other States from developing methods for spot checks that in-

volve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative.

*Id.* at 663, 99 S.Ct. at 1401. If anything, the Basilone Road checkpoint permits less officer discretion and has more visible evidence of authority than the roadblocks contemplated in *Prouse.* Compare, *e.g., United States v. Prichard,* 645 F.2d 854, 856–57 (10th Cir.), *cert. denied,* 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981).

This circuit's decision in *United States v. Maxwell,* 565 F.2d 596 (9th Cir.1977), does not require a different result. Not only was the stop in *Maxwell* on a lonely road where there could be no assurance that the stop was routine, but *Maxwell* was decided prior to *Prouse*'s constitutional approval of roadblock stops. *See* 565 F.2d at 598.

We therefore conclude that this case falls squarely within *Martinez-Fuerte* and *Prouse.* The decision of the district court must be affirmed.