**UNITED STATES of America,**
**Plaintiff,**

v.

**Michael CHARRINGTON, Defendant.**

No. CR–3–98–56.

United States District Court,
S.D. Ohio,
Western Division.

Aug. 5, 2003.

James Duane Brubaker, WPAFB, OH, for Plaintiff.

Cheryll A. Bennett, Federal Public Defender, Dayton, OH, for Defendant.

OPINION AND ORDER REVERSING THE JUDGMENT OF CONVICTION ENTERED BY THE UNITED STATES MAGISTRATE JUDGE; CASE REMANDED WITH DIRECTIONS TO SUPPRESS EVIDENCE SEIZED FROM DEFENDANT'S VEHICLE AND FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION AND ORDER

RICE, Chief Judge.

Defendant Michael Charrington now appeals the judgment of the United States Magistrate Judge, entered following Defendant's entering a conditional plea of guilty to one count of possession of marijuana, in violation of 21 U.S.C. § 844(a). The Court has appellate jurisdiction over the United States Magistrate Judge's judgment of conviction per 18 U.S.C. § 3402. Defendant contends that the Magistrate Judge erred by not suppressing the evidence used against him to establish his guilt. The Court agrees. Accordingly, the judgment shall be reversed and the case remanded for further proceedings consistent with this order.

I. *Factual Background*[1]

In effect at Wright Patterson Air Force Base ("WPAFB" or "Base") at the time of the events giving rise to this action was Air Force Operating Instruction 31–9 ("AFOI 31–9"), which established a procedure for conducting random vehicle checks at installation entry/exit points. (Supp. Tr. at Ex. 2.)[2] AFOI 31–9 authorized teams of the WPAFB Security Forces ("SF members") to select at random vehicles entering and exiting the Base, as di-

---

1. For purposes of ruling on Defendant's appeal, the Court will construe the facts in a light most favorable to the Government.

2. The Court will designate the transcript of the suppression hearing, held on January 15, 1999, as "Supp. Tr." It is docketed as Document No. 31 in the Court's case file.

rected by the Installation Commander, and, after informing a selected vehicle's occupants of what to expect, to conduct a thorough check of the interior of the vehicle. (AFOI 31–9 ¶¶ 3, 4.4.1, 4.4.1.1, 4.4.1.2, 4.4.1.3, 4.4.1.4 & 4.4.1.5.) AFOI 31–9 expressly defined such vehicle inspections as being ones "without the foundation of a search" (as would be warranted under the Fourth Amendment). (*Id.* ¶ 3.) The purpose of the policy was "to protect the security of the command and to protect government property" (*id.*), and it was expressly contemplated that SF members assigned to such checkpoints were "acting, not in their law enforcement capacity, but as … sentinel[s] safeguarding a military installation and government property." (*Id.*)

Where the operator of a randomly selected vehicle refused to consent to an inspection, an SF member was to "advise the operator a refusal may result in the loss of base driving privileges, revocation, loss of base vehicle registration, barment from the base and/or administrative or judicial action." (*Id.* ¶ 4.4.3.) If the operator continued to refuse, and *was a civilian*, such as Defendant herein, the SF member was to "[r]ecord the identification of all occupants and inform them they may not enter the base at any other entry point," and then make "a walk-around examination of the vehicle for evidence that may be used as a foundation for search authorization, such as contraband or government property in plain view." (*Id.* ¶ 4.4.3.2.) In the event the walk-around examination did not give rise to probable cause to suspect criminality, the SF member was to "deny entry and allow the vehicle to exit the base." (*Id.*) SF members had no authority to deviate from AFOI 31–9. (Supp. Tr. at 12.)

On February 7, 1998, Defendant was stopped while attempting to enter WPAFB by SF member Sgt. Jeffrey Hall, pursuant to AFOI 31–9. (*Id.* at 6.) Informed of the inspection procedure, Defendant refused to consent to the search of his vehicle. (*Id.* at 7.) Advised of the consequences of his refusal to consent, he again said "no." (*Id.*) He asked Sgt. Hall if he could leave the base, but received no answer. (*Id.* at 37, 42.) Sergeant Hall observed a pack of Glad plastic baggies in Defendant's right-hand pocket and a pack of Joker rolling papers on his lap. (*Id.* at 7.) At that point, Sgt. Hall asked Defendant to pull over to the side of the traffic lane and to step out of his vehicle and provide identification, a request with which Defendant complied. (*Id.* at 7–8.) At that point, Sgt. Hall noticed Defendant's hands shaking. (*Id.* at 8.)

Sergeant Hall was of the belief that he had probable cause to justify further inspection of Defendant's vehicle (*id.* at 26–27, 33), but to be certain, he contacted his desk sergeant, who contacted Captain Dinell at the Base legal department, and the three of them discussed the situation. (*Id.* at 8–9, 34.) Meanwhile, two other SF patrol vehicles were summoned to the scene to serve as backup, bringing to three the total number of vehicles responding to the situation with Defendant. (*Id.* at 29.) At the conclusion of their conversation, Captain Dinell told Sgt. Hall that the facts would probably not justify a search of Defendant's vehicle based on probable cause. (*Id.* at 18–20.) Denied the authority to inspect Defendant's vehicle without consent, Sgt. Hall was instead instructed to ask the Defendant once more for his consent. (*Id.*) A separate attempt had also been made to contact Defendant's mother, a former member of the Air Force and the registered owner of Defendant's vehicle, for consent to inspect the vehicle. (*Id.* at 29.) Defendant finally gave Sgt. Hall his consent, approximately 38 minutes after the beginning of his detention, and Sgt. Hall proceeded to inspect the vehicle, ulti-

mately finding the marijuana in question. (*Id.* at 20–21, 24, 39.)

From the moment Defendant was asked to step out of his car to the point Sgt. Hall received Defendant's consent to search his vehicle, about 33 minutes, Defendant stood outside in what Sgt. Hall described as "cold" weather. (*Id.* at 9, 24, 33.) His request to sit in his car to keep warm while under the watch of other SF members was refused (*id.* at 38–39), and he neither asked for permission nor received an invitation from any of the officers to sit in one of the patrol vehicles prior to giving his consent to the inspection of his car. (*Id.* at 10, 30–31.) Defendant was not formally "under arrest" during this time, but he was considered "detained." (*Id.* at 26.)

## II. *Analysis*

▮ In reviewing the Magistrate Judge's judgment, the Court is to apply the same scope of review as a United States Circuit Court of Appeals would apply in considering an appeal of a judgment from a United States District Court. Fed. R.Crim.P. 58(g)(2)(D). Because Defendant's appeal turns on the correctness of the Magistrate Judge's decision denying his Motion to Suppress, the Court will uphold the Magistrate Judge's findings of fact as to that issue unless they are clearly erroneous, and review his legal conclusions *de novo*. *See United States v. Dupree*, 323 F.3d 480, 484 (6th Cir.2003). The evidence will be construed in a light most favorable to the Government. *See United States v. Galloway*, 316 F.3d 624, 628 (6th Cir.2003).

▮ An arrest constitutes a seizure that must be justified by probable cause. *See Dunaway v. New York*, 442 U.S. 200, 208, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). A brief detention, though a seizure, need not be deemed an "arrest," and does not violate the Fourth Amendment, as long as the purpose therefore is based on a rea-sonable suspicion that criminal activity is afoot, and as long as the scope, duration and intensity of the detention reasonably relates to the circumstances which justified it in the first place. *See Terry v. Ohio*, 392 U.S. 1, 16–22, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

▮ The stopping of an individual at a law enforcement checkpoint constitutes a "seizure" within the meaning of the Fourth Amendment. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 40, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000); *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 450, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Checkpoints present an interesting exception to the *Terry* standard, and will not be deemed unconstitutional merely because a stop made pursuant thereto is not based on an "individualized suspicion of wrongdoing" under the rationale set forth in *Terry*. *Edmond*, 531 U.S. at 37, 121 S.Ct. 447; *United States v. Martinez–Fuerte*, 428 U.S. 543, 557, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (recognizing the impracticality of requiring all checkpoint stops to be based on reasonable suspicion); *id.* at 562 (holding that checkpoint stops need not be supported by individualized suspicion). In general, checkpoints are lawful, and need not be justified by a reasonable and articulable suspicion of wrongdoing (let alone probable cause), as long as they are conducted pursuant to an established and objectively fair set of principles, and not left to the discretion of the enforcing officers. *See Prouse*, 440 U.S. at 663, 99 S.Ct. 1391. "Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. 47, 50–

51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (the three-part *Brown* balancing test).

Procedures established at military installations are deserving of special consideration. *See generally, Greer v. Spock,* 424 U.S. 828, 837–38, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). *E.g., United States v. Jenkins,* 986 F.2d 76, 78–79 (4th Cir.1993) (holding that a civilian who has entered a closed military installation gives his implied consent for his person and vehicle to be searched, and observing that as a matter of common sense a civilian should not expect the same right of privacy thereon as he would outside the installation); *cf. United States v. Ellis,* 547 F.2d 863, 865–66 (5th Cir.1977) (finding that civilian defendant had given his consent to the search of his vehicle when he had entered the military installation subject to his visitor's pass, which stated on its face: "Acceptance of this pass gives your consent to search this vehicle while entering, aboard, or leaving this station").

With respect to checkpoints established at military installations, the federal courts have liberally applied the balancing test set forth in *Brown* in favor of the military, in deference to the military's right and responsibility to address inherent and obvious security concerns. For example, in *Morgan v. United States,* 323 F.3d 776 (9th Cir.2003), a civil action brought by a plaintiff against military officials for the unlawful search of his vehicle pursuant to a military installation entryway checkpoint, the Ninth Circuit directed the district court to consider, upon remand, whether the plaintiff gave his "implied" consent to the search, stating that if he did, the district court was to deem the search constitutional. 323 F.3d at 782. Recognizing that the military has a clear interest in preventing the in-flow of contraband and unauthorized weapons and the out-flow of military property, checkpoints such as the one at issue herein have been

deemed constitutional in factually similar circumstances. *See United States v. Ellis,* 15 F.Supp.2d 1025 (D.Colo.1998); *United States v. Dillon,* 983 F.Supp. 1037 (D.Kan. 1997); *United States v. Santiago,* 846 F.Supp. 1486 (D.Wyo.1994); *United States v. M.J.,* 716 F.Supp. 295 (W.D.Ky.1989); *United States v. Hernandez,* 739 F.2d 484 (9th Cir.1984).

The checkpoint policy at issue herein, AFOI 31–9, is deserving of special deference for the reasons set forth in *Ellis, Dillon, Santiago, M.J.* and *Hernandez,* and the more general checkpoint case law of the United States Supreme Court, namely *Edmond, Brown, Prouse* and *Martinez–Fuerte.* That a checkpoint policy might pass muster under the standard set forth in *Brown,* however, does not mean that the law enforcement officers conducting a check can escalate the detention (i.e., seizure) of the person being checked into something more where the goals of the checkpoint policy have already been met. At that point, there is no longer any deference to a prescribed military checkpoint policy to be given, because the policy no longer governs the situation. If the actions in question from that point forward are to be found constitutional, they must be justified by probable cause. *See Martinez–Fuerte,* 428 U.S. at 567, 96 S.Ct. 3074 (emphasizing that where a stop goes beyond that justified by the underlying purpose of a legitimate checkpoint, any further detention must be based on consent or probable cause).

In moving to suppress the marijuana seized from his vehicle after he gave his consent to Sgt. Hall to inspect same, Defendant raised two general arguments. *First,* he argued that his detention and the search of his vehicle were unreasonable under the three-part *Brown* balancing test. Under the *Brown* standard, he acknowledged the military's clear interest in safe-

guarding its installations by checking for contraband (Doc. # 10 at 5–6), but argued with greater particularity that the degree to which AFOI 31–9 advanced that interest was unreasonably excessive (*id.* at 6), and that the detention and search of his vehicle were excessively severe, such that they unlawfully interfered with his individual liberty (*id.* at 6–7). *Second,* Defendant argued that the consent he ultimately gave to Sgt. Hall to inspect his vehicle was not voluntary, but, rather, was given only as a means to get back into his car to get warm, having stood outside in the cold for over a half-hour while Sgt. Hall conversed with Captain Dinell. (*Id.* at 9–10.) In denying Defendant's Motion, the United States Magistrate Judge held that the checkpoint stop was constitutional under *Brown* and found that the facts did not support Defendant's claim that he had no means of keeping warm while Sgt. Hall obtained legal advice from the WPAFB legal office. (Doc. # 23 at 2–3.)

While the Court agrees with the Magistrate Judge's holding as it focused on the constitutionality of the checkpoint stop in the first instance, and thus agrees that Defendant's argument that AFOI 31–9 did not advance WPAFB's legitimate security interest is without merit, it finds that the Magistrate Judge did not address Defendant's argument concerning the third prong of the *Brown* balancing test, *viz.,* the extent to which Sgt. Hall interfered with his individual liberty. Defendant's argument in his Motion to Suppress (and now on appeal) was not limited to the assertion that his rights were violated when he was stopped at the checkpoint; the intrusion of which he complained continued long past that initial point in time. On this point, he emphasized the materiality of his having to stand in the cold for over a half-hour while Sgt. Hall consulted with the WPAFB legal office:

> In regard to the objective intrusion, Mr. Charrington's initial detention lasted for at least 1/2 hour while Hall tried to get him to consent to the search. Although that is not, objectively, a long period of time, it is a great deal longer than the initial detentions of less than a half of a minute that were upheld in *Stitz* [sic] or *Martinez–Fuerte.* ... It is clear that the objective intrusion into Mr. Charrington's privacy was not limited by appropriate operating procedures, but was unnecessarily high due to the lack of limitation on Hall's discretion to detain him while he coerced consent from him.

(Doc. # 10 at 6–7.) This prong of Defendant's first argument was not addressed in the United States Magistrate's opinion, but provides, in this Court's opinion, the proper basis for suppressing the evidence seized from Defendant's vehicle. (The Court need not, and does not, consider Defendant's argument that his subsequent consent was not voluntary.)

■ For the reasons which follow, the Court finds that when Sgt. Hall refused to let Defendant exit the WPAFB premises after he refused (*for the second time*) to give consent for the inspection of his vehicle, despite having been advised of the consequences of his refusal, Sgt. Hall violated Defendant's rights under the Fourth Amendment. To be clear from the outset, it is not AFOI 31–9 that was infirm, but the individual actions of Sgt. Hall (and any others who assisted him in exceeding his authority under AFOI 31–9). With that in mind, the Court begins with the understanding that AFOI 31–9 was a legitimate military checkpoint policy and that Sgt. Hall had every right to stop Defendant pursuant thereto when the latter attempted to enter WPAFB.

Asked at the suppression hearing whether he noticed "anything unusual" about Defendant at the time he refused, for the second time, to consent to the

search of his vehicle, Sgt. Hall stated as follows:

> Yes, I did. He still stated no, he didn't want to do the inspection, and he had a long coat on that came down to just above his knees. In his pocket—I believe it was his right hand pocket on the right hand side, he had a pack of Glad plastic baggies. In his lap was a pack of Newport cigarettes and a package of Joker rolling papers. He was also smoking one of the Newport cigarettes as he came through the gate.

(Supp. Tr. at 7.) He commented further that because he was of the opinion that most smokers usually stick to a single brand of cigarette, he deduced that Defendant's rolling papers served an illegal purpose, given that he was already smoking a Newport. (*Id.* at 33.) According to Sgt. Hall, these factors made it seem to him as if Defendant "had something to hide," and he clarified that Defendant's refusal to cooperate was one such factor he considered troubling. (*Id.* at 34, 35.) Immediately thereafter, Sgt. Hall asked Defendant to pull over and exit his vehicle, which Defendant did, at which time Sgt. Hall observed that Defendant appeared nervous, his hands shaking. (*Id.* at 7–8.)

In denying Defendant's Motion to Suppress, the Magistrate Judge did not rest his decision on a showing of probable cause, but on a finding that WPAFB was within its right to stop Defendant in the first instance pursuant to AFOI 31–9, and subsequently within its right to inspect the interior of Defendant's vehicle per Defendant's consent. It makes sense that the Magistrate Judge's ruling was not bottomed on the existence of probable cause, given the fact that not even Captain Dinell, of the WPAFB's legal office, thought that the facts supported a probable cause basis to inspect the vehicle. Captain Dinell was correct. " '[P]robable cause' . . . means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) (citations omitted). Clearly, Sgt. Hall did not have probable cause to suspect Defendant had committed, was committing, or was about to commit, a crime, where the only facts known to him were that Defendant had exercised his legal right to refuse to consent to an inspection, was wearing a perfectly normal and appropriate jacket for the season, was smoking a cigarette, and possessed rolling papers and plastic baggies, two legal objects.

If one's refusal to cooperate with law enforcement were enough to justify prolonged detention at a WPAFB entry gate, no matter the circumstances, the procedures set forth in paragraph 4.4.3.2 of AFOI 31–9, not to mention the strictures of the Fourth Amendment, would mean little to nothing, and there is certainly nothing unusual about wearing a knee-length coat in the winter or a teenager smoking cigarettes. Furthermore, while it is common knowledge that rolling papers and plastic baggies are often used as instruments in the trade and consumption of marijuana, any number of legal items and substances can be used to serve illegal ends, but their mere presence, without more, does not justify prolonged detention. Even taken in their totality, all of these quite legal actions are not nearly enough to justify Defendant's detention past that justified by AFOI 31–9 itself. It is to the parameters of the official checkpoint policy, then, that the Court now turns.

Sergeant Hall acknowledged at the suppression hearing that per the policy set forth in AFOI 31–9, the thing to do, when a civilian refused to consent to an inspection, was to obtain his personal information, do a plain view, walk-around inspec-

tion of the vehicle, and direct the civilian to exit the Base. (Supp. Tr. at 19.) He also acknowledged that he did not follow that procedure in this case (*id.*), even though he also acknowledged that he had no authority to deviate therefrom. (*Id.* at 12 & 14.) In other words, in his own testimony, albeit in piecemeal fashion, Sgt. Hall acknowledged that he detained Defendant in violation of AFOI 31–9.

If the initial purpose justifying a checkpoint stop has been met, and if probable cause is lacking to escalate the detention into an actual arrest, then the Fourth Amendment requires that the detainee be let go. If the detainee is not let go, then the Fourth Amendment is violated. If evidence is subsequently seized, it must be suppressed under the exclusionary rule, as fruit of the poisonous tree. *See Northrop v. Trippett,* 265 F.3d 372, 383 (6th Cir. 2001). Unquestionably, the military is within its right to promulgate and enforce procedures for inspecting vehicles entering the confines of its installations, but when the purpose for such inspections has been accomplished, the Fourth Amendment prohibits further detentions and intrusions *if not justified by probable cause. See Martinez–Fuerte,* 428 U.S. at 567, 96 S.Ct. 3074.

The cases cited herein by the Government, along with the additional authorities noted above by the Court, supporting the notion that military installation checkpoints are deserving of great deference, are inapposite. They stand for the proposition that the United States Military has an inherent right to protect its installations in a manner that is reasonable under the given circumstances, even if the procedures employed might not be deemed reasonable in a civilian context. With this proposition in mind, the Court reiterates that it agrees that the procedures set out in AFOI 31–9 pass constitutional muster, but that only means that SF members,

Sgt. Hall in particular, were within their right to carry out their duties per the terms of the policy. The proposition ceases being applicable where the SF members go beyond their authorized duties. At that point, there is no longer any deference to a prescribed military policy to be given, because the policy no longer governs the situation. If the actions in question are to be found constitutional, they must be justified by probable cause. *See Martinez–Fuerte,* 428 U.S. at 567, 96 S.Ct. 3074 (emphasizing that where a stop goes beyond that justified by the underlying purpose of a legitimate checkpoint, any further detention must be based on consent or probable cause).

With that said, the Court observes that the Government has not demonstrated by what authority it was entitled to detain Defendant in the manner it did, after it had exhausted the procedures set forth in AFOI 31–9. As noted above, Sgt. Hall, as evidenced by his own testimony, violated the terms of AFOI 31–9 in detaining Defendant past the time that, under the policy, Defendant should have been directed to exit the base. Therefore, if his authority did not come from AFOI 31–9, it must have come from SF members' general law enforcement powers, but it could not have, because the policy expressly stated that SF members were not serving in "their law enforcement capacity," a fact which Sgt. Hall understood. (Supp. Tr. at 11.) In other words, the procedures of AFOI 31–9 having been exhausted, it was not within the bailiwick of Sgt. Hall and other SF members at the scene to engage in continuing law enforcement activities with respect to Defendant.

For this reason, the evidence seized must be suppressed.

█ Even if SF members were authorized to engage in a more generalized law enforcement capacity, such that Sgt. Hall might have been within his right to briefly

detain Defendant under *Terry,* Defendant's detention (i.e., the seizure of his person), under the totality of the circumstances, was unreasonable in its initiation, duration and intensity, rendering the seizure of the marijuana which followed unconstitutional.

To begin, and keeping in mind that at this point the Court is discussing a legal basis for detaining Defendant other than AFOI 31–9, the Court does not agree with the Government, to the extent its argument can be construed in such fashion, that the factual basis proffered by Sgt. Hall for detaining Defendant (which in Sgt. Hall's opinion gave rise to probable cause) supports a showing of reasonable suspicion (let alone probable cause) to suspect Defendant of wrongdoing in the first instance. In each of the cases cited above involving military checkpoints and similar predicate facts, and concerning initial checkpoint stops which escalated into more intrusive searches and seizures, there was substantially more evidence giving rise to a reasonable suspicion of wrongdoing on the part of the occupants of the vehicles subjected to the search. *See Ellis,* 15 F.Supp.2d 1025 (erratic driving as car approached checkpoint and smell of marijuana emanating from the car when stopped); *Dillon,* 983 F.Supp. 1037 (odor of alcohol on occupant's breath when stopped); *Santiago,* 846 F.Supp. 1486 (erratic driving as car approached checkpoint, smell of alcohol on occupant's breath when stopped, and glassy and bloodshot eyes); *M.J.,* 716 F.Supp. 295 (large number of beer cans inside car in plain view of stopping officer); *Hernandez,* 739 F.2d 484 (arms and legs of unknown passengers, partially hidden by a blanket, in plain view of stopping officer enforcing a checkpoint established for the purpose of catching the smuggling of illegal aliens). The Court finds that the Government has not made its case herein that rolling papers and plastic baggies provide an equivalent basis for developing a reasonable suspicion of wrongdoing, and there has been no suggestion that Defendant was suspected of carrying a weapon or posed a threat of any sort.

For this reason, too, the evidence must be suppressed.

Finally, even assuming for the sake of argument that an objective, reasonable law enforcement officer would have suspected wrongdoing on the part of Defendant because he (1) exercised his legal right of refusing to consent to the inspection of his vehicle; (2) exercised his legal right to wear a knee-length jacket in the month of February; (3) exercised his legal right to smoke a cigarette; and (4) exercised his legal right to carry on his person cigarette rolling papers and plastic baggies, Sgt. Hall's seizure of Defendant exceeded the scope of what is permissible under *Terry* and its progeny in both duration and intensity.[3]

---

**3.** It bears emphasizing why Defendant's prolonged detention cannot be justified on the "implied consent" rationale set forth in *Morgan, supra,* and *Jenkins, supra.* With respect to *Jenkins,* the defendant was already on the installation and had made threats of violence against his wife, who worked there. When his wife spotted his car, he quickly drove toward the gate, where he was stopped by guards who had been radioed and briefed about the circumstances. For its part, *Morgan* did not conclude that the civil plaintiff had given his implied consent, merely that the district court should consider whether he did.

In any event, though the facts of that case are similar to those herein, its rationale is not persuasive for several reasons. *First,* the decision purported to follow *Jenkins* and *Ellis,* but those cases were inapposite. As noted, the defendant in *Jenkins* was already on the installation and was known to have made threats against his wife. He was not merely at the entry gate, refusing to consent to an inspection. *Ellis,* for its part, was even less on point, the defendant therein having given his consent by accepting the express terms of the visitor's pass, a fact which the Ninth Circuit

■ It is well established that in some instances, an unreasonably long detention, initially justified by *Terry,* might ripen into a *de facto* arrest, such that the Fourth Amendment is violated, because the "arrest" is not supported by probable cause. *See, e.g., Dunaway,* 442 U.S. at 212–13, 99 S.Ct. 2248; *United States v. Butler,* 223 F.3d 368, 374 (6th Cir.2000). In this case, Defendant's prolonged detention, not justified by AFOI 31–9, was unreasonably long. Even assuming *arguendo* that Sgt. Hall had reasonable suspicion to detain Defendant outside of his car, it was absolutely unnecessary to detain him for as long as he did. Only a showing of probable cause could have justified such a detention, but as the Court has already noted (and as WPAFB's own legal officer opined), no such showing can be made based on the given set of facts. Frankly, it is immaterial whether Defendant could have requested to sit in one of the patrol vehicles to keep warm while Sgt. Hall spoke with the WPAFB legal office, and the Court need not draw any inferences or conclusions from the fact that he remained standing in the cold for at least 33 minutes. At the end of the day, the infirmity with his detention was not that it caused his prolonged exposure to the elements, though that type of fact might usually be something to consider as part of the totality of the circumstances, but was, rather, its wholly unjustified duration.

Possession of cigarettes, a knee-length jacket, rolling papers and plastic baggies simply do not warrant, under *Terry,* what was at minimum a 38–minute involuntary detention. This is not to suggest that every *Terry* stop that exceeds a few minutes in duration ripens into an arrest that can only be justified by probable cause, as it is often repeated that there is no bright line between a *Terry* stop and a *de facto* arrest, *see United States v. Place,* 462 U.S. 696, 709, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *Centanni v. Eight Unknown Officers,* 15 F.3d 587, 590 (6th Cir.1994), and when determining whether a stop in the absence of probable cause is reasonable under *Terry,* the Court is to judge the facts " 'against an objective standard: would the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate.' " *United States v. Hardnett,* 804 F.2d 353, 356 (6th Cir.1986) (quoting *Terry,* 392 U.S. at 21–22, 88 S.Ct. 1868). In the case at bar, the Court is merely deciding that *in this case, given this set of facts,* the duration and severity of Defendant's detention was not justified under *Terry,* and the Government has pointed to no authority that gives the Court even the slightest pause in reaching this decision. *Accord Florida v. Royer,* 460 U.S. 491, 501–08, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality) (finding that a 15–minute detention exceeded scope of permissibility under *Terry* ); *United States v. Acosta–Colon,* 157 F.3d 9, 20–21 (1st Cir.1998) (30–minute detention too long); *Robles v. Albrecht,* 2002 WL 230798 (E.D.Mich.2002) (30 to 45–minute detention too long). At most, these facts might have justified conducting a pat down of Defendant's person for con-

omitted from its analysis. *Second,* it bears pointing out that the state court, in which criminal charges were originally brought against the civil plaintiff in *Morgan,* did in fact suppress the evidence seized from his vehicle. 323 F.3d at 779. *Third,* the policy at issue herein, AFOI 31–9, expressly set forth the terms of what to do in the event a civilian occupant refused to cooperate, the ultimate remedy being to refuse him entry, not involuntary detention. By subjecting Defendant to involuntary detention, Sgt. Hall was acting at his own discretion, and in contravention of the express terms of AFOI 31–9, which prohibited SF members from acting in a general law enforcement capacity, a fact which he acknowledged. (Supp. Tr. at 11, 12 & 19.)

traband, *e.g., Minnesota v. Dickerson,* 508 U.S. 366, 373–76, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), but they did not justify the inordinately long detention that ultimately led to a search of his vehicle. *See Royer,* 460 U.S. at 499, 103 S.Ct. 1319 ("In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects.").

For this reason, too, the evidence must be suppressed.

In sum, the Court finds that Defendant's detention, viewed in its entirety and not limited to the moment he was initially stopped at the WPAFB checkpoint pursuant to AFOI 31–9, was unlawful because "the severity of the interference" with his liberty was unconstitutionally excessive. *See Brown,* 443 U.S. at 51, 99 S.Ct. 2637. After Defendant twice refused to allow Sgt. Hall to inspect his car, he should have been directed to leave the Base, per paragraph 4.4.3.2 of AFOI 31–9. The procedures set forth in AFOI 31–9 having at that point been exhausted, and the prescribed remedy having been to refuse Defendant entry, the Government cannot seriously argue that military security continued to be a concern to Sgt. Hall, justifying further detention. Moreover, Sgt. Hall and the other SF members involved did not have the authority to invoke general law enforcement powers to detain Defendant, and, in any event, even if they had, Defendant's prolonged detention was not justified by probable cause or even reasonable suspicion. His ultimate consent to search his vehicle is immaterial because Sgt. Hall and the other SF members responsible for his detention had no right to detain him up to that point in the first place. *See Royer,* 460 U.S. at 501–02, 103 S.Ct. 1319. For all of these reasons, the evidence seized must be suppressed as fruit of the poisonous tree.

### III. *Conclusion*

For the reasons and citations of authority given, the Court finds Defendant's appeal to be well taken. The judgment of conviction entered by the United States Magistrate Judge is reversed. The case shall be remanded for further consideration. Upon remand, the Magistrate Judge should order that all evidence seized from Defendant's vehicle following his 38–minute detention be suppressed.