**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4606

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee,

v.

LEROY MOORE, JR.,

　　　　Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at New Bern.  Louise W. Flanagan, District Judge.  (7:16-cr-00048-FL-1)

Argued:  January 30, 2020　　　　　　　　　　Decided:  March 4, 2020

Before WILKINSON, DIAZ, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Diaz and Judge Floyd joined.

**ARGUED:**  Peter Marshall Wood, LAW OFFICE OF PETER WOOD, Raleigh, North Carolina, for Appellant.  Kristine L. Fritz, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:**  Robert J. Higdon, Jr., United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, Phillip A. Rubin, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

WILKINSON, Circuit Judge:

In July 2014, appellant Leroy Moore, Jr. was stopped at a routine traffic checkpoint operated by the Columbus County, North Carolina Sheriff's Office ("CCSO"). During the stop, CCSO deputies discovered that Moore was in possession of a substantial quantity of illegal drugs. He was arrested and subsequently indicted by a grand jury in the United States District Court for the Eastern District of North Carolina for possession with intent to distribute twenty-eight or more grams of crack cocaine in violation of 21 U.S.C. § 841(a)(1). Prior to trial, Moore moved to suppress all evidence obtained by CCSO officers on the grounds that the traffic checkpoint at which he was stopped was conducted in violation of the Fourth Amendment. The district court denied the motion. Moore then pleaded guilty but reserved his right to file this appeal challenging the denial of his suppression motion. Because we hold that the CCSO checkpoint fully complied with the dictates of the Fourth Amendment, we affirm the judgment of the district court.

I.

In the early morning hours of July 1, 2014, several CCSO officers decided to set up a traffic checkpoint. Sergeant Adam Gore, the supervisor on duty, organized and personally oversaw operation of the checkpoint, which began at approximately 1:30 am on Tuesday morning at the intersection of a well-travelled county road. Four CCSO deputies manned the checkpoint alongside Sergeant Gore. Per CCSO policy, officers parked several marked squad cars on the side of the road and activated their blue emergency lights to alert motorists of the upcoming roadblock. They also placed traffic cones in the road to ensure

2

that drivers would be aware that they were required to stop. All officers involved wore uniforms and reflective vests and hats.

According to CCSO Deputy Christopher Canady, who was on the scene that evening, the purpose of the checkpoint was "to make sure that . . . drivers [were] in compliance with the entirety of Chapter 20," which is the portion of North Carolina's code regulating the use of motor vehicles. J.A. 82. Sergeant Gore instructed deputies to stop each car that came through the checkpoint and ask the driver to present a license and vehicle registration. Gore later testified that it was CCSO policy to stop every passing car at the traffic checkpoint. Deputies were trained to look specifically for violations of motor vehicle laws and to issue citations if those violations were discovered. They were permitted to detain motorists beyond the time needed to verify their license and registration only if the deputy became aware of other facts suggesting criminal activity.

At some point that morning, Moore was stopped at the CCSO checkpoint. As Moore pulled up to the roadblock, Deputy Canady observed that Moore's vehicle appeared to have bullet holes in the driver's side door. Canady approached Moore's car and immediately noticed the odor of marijuana and saw smoke emitting from the passenger area. He requested that Moore provide his driver's license, and Moore did so. Canady then questioned Moore regarding the smell, whereupon Moore candidly admitted that he had just extinguished a "blunt," which Canady took to mean a marijuana cigar. J.A. 71.

At this point, Deputy Canady ordered Moore to exit his vehicle and requested permission to search it. Moore complied and subsequently consented to a search of his car. Canady patted Moore down and discovered four bags containing an off-white, rock-like

3

substance in his pants leg, approximately $100 in cash in one of his pockets, and a small bag containing two pills in another pocket. In the ensuing search of Moore's vehicle, Canady found multiple off-white rock substances on the floorboards, an electronic scale and empty medication bottle covered in white residue, a half-burnt cigar filled with what appeared to be marijuana, an assault rifle, two loaded rifle magazines, and 37 rounds of ammunition. Moore was then placed under arrest, and Sergeant Gore put him into his squad car. The checkpoint terminated soon thereafter; Moore was the only person arrested during the operation.

The off-white substance that CCSO officers found on Moore's person and in his vehicle was tested and found to be crack cocaine. Moore was subsequently indicted for possession with intent to distribute twenty-eight or more grams of crack in violation of 21 U.S.C. § 841(a)(1).

Moore filed a motion to suppress all evidence obtained from the searches of his person and vehicle at the CCSO checkpoint. The crux of his argument was that the checkpoint itself violated the Fourth Amendment because (1) its primary purpose was advancing a general interest in crime control, which the Supreme Court has held to be an impermissible objective for suspicionless checkpoints, and (2) it was conducted in an unreasonable manner because there were no formal policies or procedures in place to limit the discretionary authority of CCSO deputies manning the stop. Thus, according to Moore, his stop amounted to an unconstitutional seizure and all evidence discovered as a result of that stop must be suppressed as fruit of the poisonous tree.

4

After a hearing, the magistrate judge issued a memorandum advising that Moore's motion be denied. J.A. 143-59. The magistrate judge found that the checkpoint had not been operated to detect general criminal activity but rather with the constitutionally permissible purpose of enforcing state licensing and registration laws. With regards to Moore's second argument, the magistrate judge concluded that because the CCSO deputies running the checkpoint were required to stop each passing car, their discretion was appropriately cabined and thus complied with the Fourth Amendment. The district court agreed with the magistrate's recommendation and denied Moore's motion. J.A. 167-77.

In light of the adverse result on his motion to suppress, Moore reached a plea deal with the government. In that agreement, he generally waived his appeal rights but specifically reserved the right to appeal the denial of his suppression motion. The district judge accepted his plea and sentenced Moore to 60 months in prison followed by five years of supervised release. This appeal followed.

II.

As Moore's counsel acknowledged at oral argument, the question presented by this appeal is a narrow one. Moore does not challenge the fact that Deputy Canady had reasonable suspicion to detain him after smelling marijuana coming from his vehicle. See Appellant's Br. 10. Nor does he contest the constitutionality of the ensuing searches of his vehicle or person. *Id.* Instead, he asserts only that the initial stop of his vehicle at the CCSO traffic checkpoint was unconstitutional. For the reasons that follow, we disagree.

5

A.

We begin with a brief overview of the law governing police checkpoints. It is well established that when police stop an automobile, even if only for a limited purpose and for a brief period, they have seized the occupants of that vehicle within the meaning of the Fourth Amendment. *United States v. Brugal*, 209 F.3d 353, 356 (4th Cir. 2000) (en banc) (plurality opinion). Thus, to pass constitutional muster, such seizures must be "reasonable." *Id.* Though a "seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing," *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000), the Supreme Court has recognized "certain limited circumstances where suspicionless [vehicle] stops are permissible," *United States v. Wilson*, 205 F.3d 720, 723 (4th Cir. 2000) (en banc). We apply a two-step analysis to determine whether a suspicionless police checkpoint like the one at issue here was constitutional. See *United States v. Fraire*, 575 F.3d 929, 932 (9th Cir. 2009).

First, we must decide whether the checkpoint had a valid primary purpose. *Edmond*, 531 U.S. at 46-48. The Supreme Court has recognized the constitutional legitimacy of checkpoints designed to intercept illegal aliens, *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), apprehend drunk drivers, *Michigan Dept. of State Police v. Stiz*, 496 U.S. 444 (1990), and solicit information from the public regarding criminal activity, *Illinois v. Lidster*, 540 U.S. 419 (2004). Of particular relevance here, the Supreme Court has suggested, and lower courts have concluded, that checkpoints conducted for the limited purpose of checking driver's licenses and motor vehicle registrations are constitutionally permissible. See, *e.g.*, *Edmond*, 531 U.S. at 37-38; *United States v. Davis*, 270 F.3d 977,

6

979-80 (D.C. Cir. 2001); *United States v. Galindo-Gonzales*, 142 F.3d 1217, 1221 (10th Cir. 1998). On the other hand, if the checkpoint's primary purpose is advancing a "general interest in crime control," it is invalid under the Fourth Amendment. *Edmond*, 531 U.S. at 48.

Second, if the checkpoint had a valid primary purpose, we then proceed to "judge its reasonableness, hence, its constitutionality, on the basis of the individual circumstances." *Lidster*, 540 U.S. at 426. The reasonableness of a given checkpoint stop "is determined by balancing the gravity of the public interest sought to be advanced and the degree to which the seizures do advance that interest against the extent of the resulting intrusion upon the liberty interests of those stopped." *Brugal*, 209 F.3d at 356; accord *Lidster*, 540 U.S. at 426-27. In conducting this balancing, we remain cognizant that the primary "evil" to be avoided in the context of suspicionless stops is the potential for abuse that obtains when officers are entrusted with "standardless and unconstrained discretion." *Delaware v. Prouse*, 440 U.S. 648, 661 (1979).

In considering a district court's denial of a motion to suppress, we review the court's legal conclusions de novo and its underlying factual findings for clear error, viewing the evidence in the light most favorable to the government. *United States v. Ellyson*, 326 F.3d 522, 527 (4th Cir. 2003). We note that, with respect to police checkpoints in particular, the primary purpose of a given checkpoint is a question of fact that we review only for clear error. See *Davis*, 270 F.3d at 980.

B.

Application of the foregoing framework to the facts at hand compels the conclusion that the CCSO checkpoint, and hence the stop of Moore's automobile, were permissible under the Fourth Amendment. At the outset, there is no question that the primary purpose of the checkpoint was valid. Both the magistrate and district judges found that the roadblock was established to check licenses, automobile registrations, and compliance with motor vehicle laws in order to "ensur[e] the safe and legal operation of motor vehicles on [the] roadways." J.A. 153; see also J.A. 172. As noted, courts have upheld the constitutionality of police checkpoints organized for such a purpose. See, *e.g.*, *Davis*, 270 F.3d at 979-80; *Galindo-Gonzales*, 142 F.3d at 1221. Indeed, though Moore raised a challenge to the primary purpose of the checkpoint below, he rightly conceded this issue on appeal. See Oral Argument at 2:49, *United States v. Moore* (No. 18-4606) (acknowledging that the CCSO checkpoint was established to run "routine driver's license and registration checks," which "is a legitimate purpose").

Turning to the question of the checkpoint's overall reasonableness, Moore does not seriously dispute that the roadblock adequately advanced a significant public interest. Nor could he. As the Supreme Court has recognized, "[s]tates have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed." *Prouse*, 440 U.S. at 658. Likewise, there is little doubt that the type of checkpoint at issue here reasonably furthered that interest. Officers set up on a well-travelled county road and checked the license and registration of every driver to

8

pass through the stop. In short, "[t]he police appropriately tailored their checkpoint stop[] to fit" their public safety objective. *Lidster*, 540 U.S. at 427; see also *United States v. Price*, 164 F. App'x 404, 405-06 (4th Cir. 2006) (holding that a checkpoint "directly advanced [the state's] interest" in ensuring compliance with automobile licensing and registration laws where it "was set up near a commercial area on both sides of a wide street" and officers "stopped every motorist approaching from either direction").

Moore largely trains his arguments on the final factor in the balancing inquiry, "the extent of the . . . intrusion upon the liberty interests of those stopped." *Brugal*, 209 F.3d at 356. Specifically, Moore asserts that the CCSO checkpoint was overly intrusive and thus violated the Fourth Amendment because "the officers conducting the checkpoint had unfettered discretion," "acted without a written plan," and did not establish preset operating hours such that the checkpoint "had no definitive scope as to duration." Appellant's Br. 12 (internal quotation marks omitted). A review of the record in this case reveals his complaints to be unfounded.

To begin with, the CCSO checkpoint was minimally intrusive. For one thing, it was clearly visible: Flashing blue lights and traffic cones warned motorists of the need to slow to a stop, and officers manning the checkpoint wore uniforms and reflective vests and hats. See *United States v. Ortiz*, 422 U.S. 891, 894-95 (1975) (noting that fixed checkpoints at which drivers "can see visible signs of the officers' authority" are less intrusive). More importantly, the checkpoint was operated pursuant to a "systematic procedure that strictly limit[ed] the discretionary authority of police officers" and reduced the potential for arbitrary treatment. *United States v. Henson*, 351 F. App'x 818, 821 (4th Cir. 2009). As

required by CCSO policy, multiple deputies manned the checkpoint, deputies were required to stop every vehicle and were trained to look primarily for violations of motor vehicle laws, and the checkpoint itself was approved and supervised by a commanding officer. Finally, deputies did not detain drivers "longer than [was] reasonably necessary to accomplish the purpose of checking a license and registration," except, as in Moore's case, when "other facts [came] to light creating a reasonable suspicion of criminal activity." *Id.* (citing *United States v. McFayden*, 865 F.2d 1306, 1311-12 (D.C. Cir. 1989)). In sum, far from exercising "unfettered discretion," the actions of CCSO officers were plainly regulated and specifically directed toward ensuring highway safety and compliance with motor vehicle laws. Such a narrowly prescribed operation clears the hurdle of Fourth Amendment reasonableness.

Moore's claim that CCSO lacked a written policy governing operation of the checkpoint does not change our conclusion. Sergeant Gore testified to the contrary at the suppression hearing that CCSO did have a written checkpoint policy with which deputies complied on the night of Moore's arrest. We need not resolve this question, because "[w]hile written guidelines governing the operation of a checkpoint [are] preferable," they are not a *sine qua non* of reasonableness. *United States v. Brock*, 632 F.3d 999, 1003 (7th Cir. 2011).

Moreover, we do not believe it is of constitutional dimension that this checkpoint lacked specific, predetermined operating hours. Moore seems to suggest that law enforcement must operate a checkpoint for a preset time period or risk running afoul of the Fourth Amendment. But the exact duration of any checkpoint will necessarily turn on a

variety of factors, such as the availability of sufficient manpower, local traffic conditions, or the need to redeploy police resources to meet a sudden emergency. Indeed, as much was true in the instant case, where Sergeant Gore shut down the checkpoint so that he and Deputy Canady could focus on processing Moore's arrest. Moore's argument fails to account for such concerns and would force police to choose between potentially invalidating every stop already made at an otherwise constitutional roadblock or ignoring competing law enforcement objectives. Moreover, it would be curious indeed if the Fourth Amendment, which is concerned with protecting individuals from overly intrusive policing, affirmatively required police to continue operating a traffic checkpoint that they otherwise would have terminated.

In short, the position that failing to establish and abide by rigid start and end times automatically transforms a lawful checkpoint into a Fourth Amendment violation is untenable, and we reject it. Cf. *United States v. Hernandez*, 739 F.2d 484, 486 (9th Cir. 1984) (affirming the constitutionality of temporary checkpoints that lasted "between one and one-half and three hours"). The case law has thus focused not on the duration of the traffic checkpoint but on the duration of the individual stop. See, *e.g.*, *Brugal*, 209 F.3d at 357.

We emphasize, however, the limits of our holding. There are no indications in the record of roving vehicular spot checks, see *Delaware v. Prouse*, 440 U.S. 648 (1979), because if there were, courts would bring the leash up short. As discussed above, the Fourth Amendment affords police a degree of latitude to conduct suspicionless checkpoint stops in furtherance of vital state interests. But it does not grant officers the right to detain

11

citizens beyond the point at which the purpose of the stop is satisfied, unless, as here, reasonable suspicion or probable cause of other criminal acts emerges. Further, all checkpoints must be "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *McFayden*, 865 F.2d at 1313 (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)). That accurately describes the checkpoint here.

III.

In sum, we conclude that the stop of Moore's vehicle complied with the Fourth Amendment and that his suppression motion was properly denied. The judgment of the district court is hereby affirmed.

AFFIRMED